BARROW *vs.* RICHARD and others.

Where the owner of a block of ground in the city of New-York divided it into lots, and sold the lots, from time to time, to different individuals, and the conveyances of the lots contained mutual covenants between the grantor and grantees, respectively, against the erection of any livery stable, slaughter-house, glue factory, &c. upon any part of the lots conveyed, or any other manufactory, trade or business, which might be anywise offensive to the neighboring inhabitants; *Held*, that the covenants in the deeds of the different lots were for the mutual benefit and protection of all the purchasers of lots in the block. And although a previous purchaser from the owner of the block could not sue at law, upon the covenant in the deed to a subsequent purchaser, the court of chancery might protect him by injunction against the carrying on of any noxious business, or trade, upon the lot of such subsequent purchaser.

Whether a subsequent purchaser from the owner of the block could maintain a suit at law in his own name against a prior purchaser, as assignee of the covenants in the deed of such prior purchaser; *Quære?*

A very highly *colored* description of the noxious effects of coal dust, in a sworn bill in chancery, although somewhat poetical, cannot be treated by the court as a mere poetic fiction; but upon demurrer to the bill, such coal dust will be considered as a real nuisance.

THIS was an appeal from a decision of the vice chancellor May 5. of the first circuit, overruling the demurrer of the defendants to the complainant's bill. In 1825, T. R. Mercein was the owner of a block of ground in the city of New-York, between McDougal street and the Sixth avenue, on the south side of Waverley Place; which he divided into thirty-nine building lots, and made a map of such division, and filed it in the office of the register of deeds. On the 22d of March, 1825, Mercein sold and conveyed five of the lots to four different persons in severalty. In each of the conveyances a condition was inserted, that the conveyance should be void if there should at any time be erected, made, carried on, permitted or suffered, upon any part of the premises so conveyed, any livery stable, slaughter house, tallow chandlery, smith's forge, furnace, brass or other foundery, nail or other iron factory, or any manufactory for the making of glue, varnish, vitriol, ink or turpentine, or for dressing or keeping skins or hides, or any distillery or brewery,

1840.

Barrow
v.
Richard.

or any other manufactory, trade or business whatsoever which should or might be *in anywise offensive to the neighboring inhabitants.* And Mercein subsequently sold more than twenty other lots in the same block, to different persons; and among them lot No. 11, subsequently purchased by the complainant, and lots No. 12 and 13, on which the defendants afterwards established their coal yard. In the conveyances of all of these lots, a similar provision was inserted, against the use of the lots for any noxious business, or any trade or business which might be offensive to the neighboring inhabitants; except that in these subsequent conveyances, the provision was in the shape of a mutual covenant between the grantor and grantee, instead of being in the form of a condition, as in the deeds for the first five lots.

The complainant had erected a valuable dwelling house, of the first class, upon his lot No. 11. And the defendants had established a coal yard on the adjoining lots, 12 and 13, which the complainant insisted was offensive to the neighboring inhabitants, and was a violation of the covenants contained in the deeds of those lots from Mercein. The object of the bill, therefore, was to compel the defendants to remove their coal yard, and for a perpetual injunction against the use of the lots for any noxious or offensive purpose, contrary to those covenants.

The following opinion was delivered by the vice chancellor upon overruling the demurrer :

McCoun, V. C. The great question is, upon the effects of the covenants in the deeds against offensive trades and business, and how far the complainant can avail himself of them. This is an important question, not only as respects this particular property, but in regard to other parts of the city, where a large amount of real estate is held under deeds and leases containing similar covenants or conditions. The clauses inserted in a few of the deeds executed by Mr. Mercein for the lots which he first sold, are in the form of

conditions—the legal effect of which would be to defeat the estate granted, in case of a breach of the condition, but no other person than the grantor or his heirs can, at law, take advantage of the condition and re-enter for a forfeiture or breach. In the subsequent deeds under which both the complainants and defendants hold, this provision is introduced by way of covenant. And though it is expressed to be a covenant mutually made between the parties to the deed, their heirs and assigns, its only object can be to restrain the grantee and his heirs and assigns, and not the grantor and his heirs. For having sold and conveyed the fee simple of the lots, the grantor and his heirs can have no use or enjoyment of the property afterwards, and therefore no need of covenants on their part, restricting them in the use or enjoyment. We are therefore to regard it as a several covenant of the grantee, made to and with the grantor, but it is nevertheless a covenant running with the land, and as such is binding upon the heir of the covenantor, and any subsequent purchaser under him, as assignee of the land ; for the covenant follows the land, and becomes obligatory upon those who succeed to the same land, whether by descent or purchase. (2 *Sugden on Vend.* 78. *Platt on Cov.* 461.)

The object of these covenants on the part of purchasers, and the reason for making it either a condition of the sale of each lot, or requiring such covenants, is very manifest. Mr. Mercein owned all the lots in the block, which from their location were calculated for good dwelling houses, and to form a respectable neighborhood. In disposing of the lots it was very important to him that the sale of one or more should not impair the value or prejudice the sales of the rest ; and hence he took care to lay the purchasers under the restrictions contained in the covenants, as to the use to be made of the lots ; thus endeavoring to enhance the value, and to encourage the erection of elegant houses, instead of suffering any of the lots to be depreciated by the introduction of stables or manufactories or business of any kind that might prove offensive or injurious to the

1840.

Barrow
v.
Richard.

character of adjoining lots or of the immediate neighborhood. In this respect the covenants were to operate for the personal benefit of Mr. Mercein while he remained the owner of any lot in the block, but if he has or shall sell off every lot, and part with all his interest in the property, (and it does not appear by the bill how the fact is,) then he would seem to have no longer any interest in the covenants, since by a breach which might subsequently be committed he would not be injured. But the question is not now upon the continuing effect of the covenants in favor of Mr. Mercein, or as to his rights and the remedies which he could pursue for a non-performance. The question now is between the different grantees of Mr. Mercein in respect to their several lots, whether one of such grantees or a purchaser under him can claim any benefit of the covenant made to and with Mr. Mercein, or can have any remedy against another grantee for a breach of such covenant. These covenants upon their face purport to include the " heirs and assigns" of both contracting parties. It has already been shown how far these covenants bind the heirs and assigns of the covenantor or purchaser, as covenants running with the land. They bind in respect to the particular lot conveyed to which the covenant relates : but where is the land to which the covenant attaches itself in the hands of Mercein, and follows upon his transfer or conveyance to a third person, so as to give that third person the benefit of the covenant as his assignee ? There is none. Selling one lot to A. in fee, and taking A.'s covenant restricting the use to be made of the lot, and then conveying an adjoining lot to B. upon similar terms, does not constitute B. the assignee of A.'s covenant. If Mr. Mercein, as the owner of land, had granted a term of years to A., taking his covenant as to the manner of using the land, and had then sold the reversion of the same land to B. in fee, here the covenant of A. would follow the conveyance of the reversion to B., and the latter would be the assignee entitled to sue at law for a violation subsequent to his purchase. It is very obvious that the present complainant

does not stand in the situation, nor is he clothed with the legal rights of such an assignee.

There is one case which I have met with that bears some analogy to the present—the case of *The Duke of Bedford* v. *Trustees of the British Museum*, in 2 *Sugden on Vendors*, *App*. 361, but no where else reported. There the duke had become the owner of Southampton House, the former owner of which, in selling other ground on which the museum stood, had taken a covenant from the purchaser that he, the purchaser, would not erect buildings on the ground conveyed to him, to the northward of the line of Southampton House. Southampton House was afterwards pulled down, and on the site of it, adjacent to the museum gardens, houses had been built by the duke of Bedford, and the question was, whether in equity he had a right to restrain the trustees of the British museum from erecting buildings in the museum gardens to the northward of the line designated, contrary to the letter of the covenant. The vice chancellor, before whom the cause was first heard, had difficulty in his own mind as to the construction to be given to the covenant, whether it was a covenant which was intended to afford additional security for certain rents reserved out of the lands conveyed to the covenantor, and if so, then he appears to have considered that it was not a covenant which ran with the land not granted, that is, with the land upon which Southampton House was built, so as to give the subsequent owners of this land a right of action at law, as assignee of the covenant ; and if no action at law could be sustained, then he considered there could be no remedy in equity. Another view, however, was urged, as the one which might be taken of the covenant, viz. that it was intended not to secure the rents merely, but to prevent such a use of the land granted as might tend to diminish either the valuable or pleasurable enjoyment of the land adjoining, on which Southampton House was built. The vice chancellor therefore stated the question to be, whether upon the whole of the deed it did appear that the covenant had been so framed as to afford evidence of

an agreement between the parties and those who should represent them, on the one hand as being the owners of Southampton House, and on the other of the land adjoining, that the latter would never use this land but in the manner prescribed, either to the prejudice of the profit or pleasure of Southampton House. If the deed afforded evidence that such were the intentions of the parties to the instrument, then he said there was a clear remedy at law against the act sought to be performed, and a clear remedy in a court of equity, by way of injunction to restrain the commission of that act. But a court of equity would only follow the law upon such an agreement and give the same construction to it, and restrain only where a court of law could give damages. He therefore concluded to send the case to a court of law, to determine what the intention of the party really was. On the hearing before Lord Eldon, it is stated that he ultimately decided that under the circumstances, considering the acts of the parties, the alteration of the property and the right to relief in equity was at an end. The grounds of Lord Eldon's determination are not given, which perhaps is to be regretted; but from the reasoning of the vice chancellor in the case, it would seem that the principle on which that case proceeded was, that the remedy in equity was to be graduated by the remedy at law upon the covenant or agreement, and where no right of action at law could be traced to the party asking the injunction, he was not entitled to it. It appears to me, however, that this is too narrow and limited a view to be taken of the powers and jurisdiction of this court in cases of this sort; and that after all, the true doctrine which governs this case is to be found in *Hills* v. *Miller*, (3 *Paige*, 254,) and in cases of that class.

With respect to the question whether the business of a coal yard is an offensive trade or business, or is among the number of things guarded against by the covenants, depends upon evidence. Enough is shown by the bill to bring it within the prohibition as a private nuisance, if not a public one. The defendants cannot, upon demurrer, gainsay the

facts alleged in the bill. How far this court interferes to restrain a nuisance of any sort, I will not now inquire. Upon the ground of a privilege, or easement created by the covenant, which it is competent for this court to protect the parties in the enjoyment of, and which constitute an equity in this bill, the demurrer must be overruled.

*W. H. Harrison & D. B. Ogden*, for the appellants. The order of the vice chancellor of the first circuit overruling the demurrers in this case, is erroneous. The complainant is not an assignee of the covenant set forth in the bill, nor otherwise entitled to the benefit of it. If an easement was created by the covenant, it was not attached to the land of the complainant. Neither party to the covenant or agreement, creating the easement, being at the time of making it, seized of such land. It does not appear by the bill of complaint that the putting of a coal yard upon the premises is a breach of the covenant in question. The court will not go out of the deed from Mercein, of the complainant's lot, to look for the agreement for an easement. The covenant in the deed to the defendants, was inserted for the grantor's benefit, and he could have released it. The complainant's deed contains no covenants as to the other lots. The complainant could not bring an action at law on the covenant in the defendant's deed; he has, therefore, no relief in equity, as equity follows law. (3 *Paige*, 254. 2 *Sug. Ven.* 409. *Ambler*, 158. 10 *John.* 298. *Platt on Cov.* 12 *to* 18.)

*C. Bushnell*, for the respondent. As part of the consideration and terms of sale from Thomas R. Mercein, of the lots in question, and those contiguous, and by express covenants in the deeds of conveyance, an easement, or privilege of exemption from all dangerous or offensive trades or business was annexed to the said lots, and formed part of their permanent value, which run with the land, to each successive owner. (*Matter of* 17th *street in N. Y.*, 1 *Wendell*, 267. *Matter of Lewis street, N. Y.* 2 *Id.*

1840.

Barrow
v.
Richard.

473, 5. *Jackson* v *Beach*, 1 *John. Ch. Rep.* 399. *Jackson* v. *Myers*, 3 *John. Rep.* 388. *United States* v. *Gurney*, 4 *Cranch*, 333. 2 *Peters' Cond. R.* 133, *S. C. Trustees of Watertown* v. *Cowen*, 4 *Paige*, 515. *Hills* v. *Miller*, 3 *Paige*, 256. *The City of Cincinnati* v. *The lessee of White*, 6 *Peters' Rep.* 432. *Livingston* v. *The Mayor, &c. of New-York*, 8 *Wendell*, 99, 105. *Beatty & Richie* v. *Kurtz and others*, 2 *Peters' Rep.* 566, 578. *Bleecker* v. *Bingham*, 3 *Paige*, 246.) Each lot is entitled to protection in the enjoyment of this easement, as against the owners of all the other lots, for the time being, and these owners are bound to respect this easement the same as if they had personally executed the deeds reserving it. (*Bleecker* v. *Bingham*, 3 *Paige*, 246. *Burnett* v. *Cumberland*, 2 *Cro. Jac.* 522. 4 *Cruise's Dig.* 65.) The business complained of in the bill is offensive, within the meaning of the covenants, and is a violation of the easement secured thereby. The ordinary jurisdiction of this court reaches this offence, this private nuisance, and will restrain it. (*Gardner* v. *The Village of Newburgh*, 2 *John. Ch. Rep.* 164, 5. *Van Bergen* v. *Van Bergen*, *Id.* 272, 3, *and cases there cited.* 1 *Mad. Ch.* 133. *Id.* 29. *Seton* v. *Slade*, 7 *Vesey*, 274, 5. *Halsey* v. *Grant*, 13 *Id.* 75, 76, 78, *and cases before cited.* *Livingston* v. *The Mayor, &c. of New-York*, 8 *Wendell*, 94, 99. *Beatty* v. *Kurtz and others*, 2 *Peters' Rep.* 566, 578.) This demurrer should be overruled, as proof properly founded on the allegations in the bill may show more fully the consideration, scope, meaning, and value of the easement, and the injuries resulting from the violation complained of; and an equity may thus be established, which will call for the interposition of this court, although it may be defectively alleged in the bill. (*Bleecker* v. *Bingham*, *before cited.* *Mitford's Ch. Pl.* 173. 1 *Ves. Rep.* 248.)

THE CHANCELLOR. From the averments in the complainant's bill in this case, which, upon the demurrer, must be taken as true, there can be no doubt that the object of

Mercein in having this restriction inserted in his convey-ances to Richard and others, was to enhance the value of the lots to all the purchasers in the block, and was intend-ed to be enforced for their benefit. In this respect the case is different from that of the Duke of Bedford relative to the buildings erecting in the British Museum gardens, cited in the opinion of the vice chancellor, from the 9th London edition of Sugden on Vendors. I have not access to that edition of Sugden at present, and therefore only recollect the case as read by the counsel, upon the argu-ment; and from the statement of it in the opinion of the vice chancellor. At the time that case came before the court of chancery in England, the splendid mansion called "Southampton House," once the residence of Rachel De Rouvigny, Countess of Southampton, "*La belle et vertueuse Huguenotte,*" and afterwards of her son-in-law, the amia-ble and talented Lord William Russel, who was beheaded in 1683, for his alleged participation in the Rye House plot, was no longer in existence; but his descendant, the Duke of Bedford, had caused a number of other houses to be erected upon the lot upon which it formerly stood. A question therefore naturally arose, whether a covenant with Lady Russel, who was temporarily the equitable owner of Southampton House, was intended for the benefit of the subsequent owners of the land on which that mansion stood at the time the covenant was entered into. And, if I recollect right, the court offered to the Duke an issue, to ascertain whether the covenant not to build upon the lands to the northward of Southampton House, was intend-ed as an easement to the lands upon which the new build-ings of the Duke were subsequently erected or not.

In the present case, I think, no one can doubt that the object of the covenants in the deeds from Mercein was to secure all the purchasers of lots in the block, against an offensive use of any other of those lots. And if lots No. 12 and 13 had been conveyed to the defendants, or to those under whom they claim, while Mercein was still the owner of lot No. 11, I am not sure that any technical difficulty

1840.

Barrow
v.
Richard.

would have arisen in the maintaining an action at law, up-
on the covenants of the grantees of the two first mentioned
lots, by the complainant, as the subsequent purchaser of
lot No. 11, and the assignee of the covenant for an ease-
ment for the benefit of that lot.   But as No. 11 was first
conveyed, and the mutual covenants in the deed refer to
that lot only, and not to other lots which still remained in
the hands of Mercein, the subsequent purchasers from him
of lots No. 12 and 13, would have taken their lots entire-
ly discharged of the easement in favor of No. 11, had it
not been for their covenants in their own deeds for the
benefit of the " neighboring inhabitants ;" that is, the own-
ers of other lots in the block.   Although the complainant
could not maintain a suit at law on that covenant, in his
own name, and would, perhaps, be only entitled to nomi-
nal damages if the suit was brought in the name of Mer-
cein, this court can give full effect to the covenant, by a
suit in the name of the party for whose benefit and protec-
tion the covenant was intended.   (*See Bleecker* v. *Bing-
ham*, 3 *Paige's Rep.* 246.)

There can be no doubt, if the allegations in the bill are
true, that the use of lots No. 12 and 13 as a coal yard is a
clear violation of the covenants of the grantees of those
lots.   The language of the covenant shows that several
other uses of the lots, far less offensive than this, are in
terms prohibited, on the ground that they would probably
be offensive to the neighborhood.   The allegation in the
bill on this subject, though it is a little poetical, cannot
be considered a mere poetic fiction ; as it is sworn to by
the complainant and is admitted by the demurrer.   He
there states that large quantities of volatile and offensive
dust and smut from the coal, rise in the air, and are diffus-
ed by the wind, into the premises of the neighboring in-
habitants.   And in spite of all their care, such coal-dust
and smut not only settles upon their walks and their grass
plats, but also on their fragrant plants and flowers, " be-
clouding the brightness and beauty which a benificent
Creator has given to make them pleasant to the eye, and

cheering to the heart of man." But what must be still more offensive to the ladies of the neighborhood, "this filthy coal dust settles upon their door steps, thresholds, and windows, and enters into their dwellings, and into their carpets, their cups, their kneading troughs, their beds, their bosoms, and their lungs ; discoloring their linen and their otherwise stainless raiment and robes of beauty and comfort, defacing their furniture, and blackening, besmearing and injuring every object of utility, of beauty, and of taste." Making all due allowance for the *coloring* which the pleader has given to this naturally *dark* picture, it is perfectly certain that this keeping of a coal yard upon any of these lots is a business offensive to the neighboring inhabitants, according to the spirit and intent of these restrictive covenants.

The vice chancellor was therefore right in overruling the demurrer. And the order appealed from is affirmed with costs.