ment was a sufficient decision under section 1010 of the Code. Eaton v. Wells, 82 N. Y. 576; Wood v. Lary, 124 N. Y. 83, 26 N. E. Rep. 338. The order for judgment was final if the terms were not accepted, and the judgment was regular, under section 1021, for that reason. The order should be affirmed, with costs and disbursements.

EQUITABLE LIFE·ASSUR. SOC. v. BRENNAN.

(Supreme Court, Special Term, New York County. January, 1893.)

1. COVENANTS—RESTRICTING USE OF LAND.
The owner of a parcel of land in a city conveyed portions of it to various persons, with covenants restricting the use of the portions conveyed. Afterwards he conveyed the residue of the parcel to defendant's grantor, subject to the same restrictive covenants. *Held*, that the covenants in the last deed were for the benefit of the prior vendees.

2. SAME—CHANGE IN USE OF PREMISES.
Where land abutting on a street occupied by railroad tracks was conveyed subject to certain restrictions as to its use by the grantees, a subsequent increase in the number of trains passing through the street, and switching them near the land conveyed, is not a change in the use of the street such as will prevent equity from enforcing the covenant, but it is a mere aggravation in the use contemplated by the parties.

3. EQUITY—JURISDICTION—AWARD OF DAMAGES.
In an action to restrain the erection of a stable on defendant's lot adjoining that of plaintiff in violation of a restriction placed on both lots by a former owner, where it appears that defendant's stable has been completed, and that the building on plaintiff's lot is an apartment house, and not his home, an injunction will be granted, to be avoided on payment of the damages caused to plaintiff's property.

Action by the Equitable Life Assurance Society against Brennan to restrain the use of defendant's premises as stables. Judgment for plaintiff.

Before MICHAEL H. CARDOZO, Esq., Referee.

Lord, Day & Lord, (Lucius H. Beers, of counsel,) for plaintiff.

Guggenheimer & Untermyer, (Moses Weinman, of counsel,) for defendant.

CARDOZO, R. Prior to April 15, 1881, the trustees of St. Patrick's Cathedral were the owners of the block of land in the city of New York, bounded westerly by Madison avenue, easterly by Fourth (or· Park) avenue, northerly by Fifty-First street, and southerly by Fiftieth street. One J. Augustus Page contracted to buy from the trustees this block of land, and in his contract of sale agreed that the westerly half of the block should be restricted as therein provided. By deed bearing date April 15, 1881, the trustees conveyed to Henry Villard, with the consent of said Page, that portion of the block which fronts on Madison avenue, being 200 feet and 10 inches in front on said avenue, and 125 feet in depth on Fiftieth and Fifty-First streets. In this deed the following covenant, pursuant to the terms of said contract, was inserted:

"And the said party of the second part, for himself, his heirs, executors, and administrators, and assigns, doth hereby covenant, promise, and agree to and with the said parties of the first part, their successors and assigns, that neither he, nor any of his heirs or assigns, shall at any future time or times erect or build, or permit or cause to be erected or built, any stable, factory, machine shop, brewery, distillery, slaughterhouse, carpenter's or smith's shop, or structure or erection for the purpose of any kind of manufacturing, or for any trade, business, or employment which shall be dangerous or noxious, or constitute a nuisance upon any part of the above-described premises; and the said party of the second part, for himself, his heirs, executors, administrators, and assigns, doth hereby further covenant, promise, and agree to and with the parties of the first part, their successors and assigns, that no building or buildings other than first-class stone or brick front dwelling houses or French apartment houses, shall be erected upon any part of the above-described premises; it being understood and agreed that the foregoing covenants on the part of the party of the second part shall run with the land, and bind all successive owners and their heirs and assigns."

The trustees thereafter conveyed all the rest of the block to said Page, and the westerly half of the block was likewise, in accordance with the terms of said contract, restricted by the same covenant as is found in the above-mentioned deed from said trustees to Villard.   By deed dated December 2, 1881, Page conveyed to Villard two lots, each 25 feet in width, on the northerly side of Fiftieth street, beginning 150 feet easterly from the point formed by the intersection of the northerly line of Fiftieth street and the easterly line of Madison avenue.   By deed dated June 23, 1881, Page conveyed to Henry Villard two lots, beginning at a point on the northerly line of Fiftieth street, distant 125 feet easterly from the northeasterly corner of Madison avenue and Fiftieth street; running thence northerly, and parallel with Madison avenue, to the southerly line of Fifty-First street, being 25 feet in front on Fiftieth street, and 25 feet in front on Fifty-First street, and about 200 feet and 10 inches in depth.   By deed dated October 21, 1881, Page conveyed to Artemus H. Holmes two lots, beginning 175 feet easterly from the northeasterly corner formed by the intersection of the easterly line of Madison avenue and Fiftieth street, running through to the southerly side of Fifty-First street, and being 25 feet in width on each street.   The foregoing deeds from Page to Villard and to Holmes were all made subject to the restrictions and covenants expressed in the deed from the trustees of St. Patrick's Cathedral to J. Augustus Page, dated April 15, 1881, and recorded in the office of the register of the city and county of New York, in Liber 1586 of Conveyances, p. 413.   By deed dated January 10, 1882, Page conveyed to Robert Goelet and Ogden Goelet the two lots of land on the southerly side of Fifty-First street, beginning 200 feet easterly of Madison avenue, each lot being 25 feet in width in front by 100 feet and 5 inches in depth on each side. This deed contained the following covenant, viz.:

"The said parties of the second part, for themselves, their heirs, executors, and administrators, and assigns, do hereby covenant, promise, and agree to and with the said parties of the first part, their heirs and assigns, that neither they, nor any of their heirs or assigns, shall at any future time or times erect or build, or permit or cause to be erected or built, any stable, machine shop, brewery, distillery, slaughterhouse, or smith's shop, upon said prem-

ises; it being understood and agreed that the foregoing covenants on the part of the parties of the second part shall run with the land, and bind all successive owners thereof, and their heirs and assigns."

By deed dated December 16, 1882, Page conveyed to Rosanna Spaulding two lots on the north side of Fiftieth street, beginning 200 feet easterly of Madison avenue, each 25 feet in width and 100 feet in depth. By deed dated March 1, 1883, Page conveyed to Abraham Benson all the rest of the block conveyed to him by the trustees, consisting of the entire front on Fourth avenue, and 150 feet in depth on each street. The deeds from Page to Spaulding and from Page to Benson both contain the same covenant that is found in the deed from Page to Goelet of January 10, 1882. After the deed from Page to Spaulding was made, two apartment houses were erected on the land therein described, and, by sundry mesne conveyances, the plaintiff, thereafter and on August 3, 1891, became the owner thereof. By deed dated February 21, 1884, one Robert C. Hine became the owner of the Fourth avenue front theretofore conveyed by Page to Abraham Benson, and, Page (Benson's grantor) having died, a release was obtained by Hine from the widow and sole legatee and devisee of Page, as to the covenant against nuisances found in the deed from Page to Benson. Thereafter the defendant, by sundry mesne conveyances, became the owner of the land on Fourth avenue, and in none of the subsequent conveyances was any reference made to the covenant found in the deed from Page to Benson. In the beginning of the month of May, 1892, the defendant filed plans in the department of buildings in the city of New York for the erection of six buildings thereon, to be used as private stables; three of them to front on Fiftieth street, and three to front on Fifty-First street, and each to be 25 feet in width. This action was brought by the plaintiff to restrain the use by the defendant of this property as stables, for the reason, as it claims, that such use is in violation of the covenant contained in the deed from Page to Benson. The notice of pendency of action was filed in the county clerk's office in and for the city and county of New York on June 22, 1892, and this action was commenced on or about that day.

The plaintiff claims that it has a right in equity to enforce the covenant found in the deed from Page to Benson, and that the release from Page's widow and sole legatee and devisee to Hine (Benson's successor in title) was wholly inoperative, for the reason that such covenant was not alone for the benefit of Page, but likewise for the benefit of Page's other grantees in the block, of whom the plaintiff's predecessor in title, Spaulding, was one. The plaintiff also claims that its grantor, Spaulding, took title 'in reliance upon an agreement, supported by a sufficient consideration, made by Page with Spaulding, that Page would restrict all the rest of the property owned by him in the block. The defendant insists that the covenant found 'in the deed from Page to Benson was solely for the benefit of Page, and that no adjoining owner can enforce it; that, therefore, Page's widow and sole legatee and devisee had an absolute right to release it, and that the release

was effectual. The defendant also claims that he took without any notice of any agreement or understanding between Page and Spaulding, and that such agreement or understanding, if any, cannot be enforced against him. The defendant also claims that there has been such a change in the use of the land on Fourth avenue as to render it inequitable, assuming the original covenants in the deeds to be still effectual, to enforce them.

The first question for determination in the case is whether the covenant against nuisances in the deed from Page to Benson was made for the benefit of the prior purchasers from Page of the adjoining lots, and therefore created an equitable easement over the lots conveyed to Benson. After a careful consideration of all the authorities cited by counsel, and many more that have been examined, it must be held that the covenant in the deed to Benson was intended to protect prior purchasers from Page of adjoining lots. At the time of the conveyance to Benson, Page had conveyed all the other portions of the block which he had owned. The conveyance to Benson was on March 1, 1883, and embraced 12 lots of land, and covers all the land Page then owned in the block, and he conveyed it with the same restrictive covenants that he had put in the prior deeds to the Goelets and to Spaulding; Page had no longer any interest in any of the land, as such, in the block. He no longer owned any of the property in the block that could be injured by any breach of the covenant. The covenant in the deed to Benson must therefore have been intended by Page for the protection of the prior vendees of lots in the block. In each deed of the easterly half of the block, Page had inserted a covenant against nuisances, and, when he parted with his last lot in the easterly half, he put in the same covenants. These facts conclusively show an intention on Page's part to establish a uniform plan of restriction as to the entire easterly half of this block.

In Post v. Weil, 115 N. Y. 361, 22 N. E. Rep. 145, in which there arose a question as to the distinction between a condition and a covenant in a deed, Mr. Justice Gray, speaking for the court of appeals, says:

"I think we all will agree that the presumption here, as in every other case where a restriction is inserted in a deed against undesirable structures or trades, is that the insertion was for the purpose of protecting rights which the grantor had in adjacent property."

In Trustees v. Lynch, 70 N. Y. 440, at page 447, Mr. Justice Allen says:

"An easement in favor of and for the benefit of lands owned by third persons can be created by grant, and a covenant by the owner, upon a good consideration, to use, or to refrain from using, his premises in a particular manner, for the benefit of premises owned by the covenantor, is, in effect, the grant of an easement, and the right to the enjoyment of it will pass as appurtenant to the premises in respect of which it was created. Reciprocal easements of this character may be created upon the division and conveyances in severalty to different grantees of an entire tract, and they may be created by a reservation in a conveyance, by a condition annexed to a grant, or by a covenant, and even a parol agreement of the grantees. Curtiss v. Ayrault, 47 N. Y. 73; Tallmadge v. Bank, 26 N. Y. 105; Gibert v. Peteler, 38

Barb. 488, affirmed 38 N. Y. 165. The right sought to be enforced here is an easement, or, as it is sometimes called, an 'amenity,' and consists in restraining the owner from doing that with and upon his property which, but for the grant or covenant, he might lawfully have done, and hence is called a 'negative easement,' as distinguished from that class of easements which compels the owner to suffer something to be done upon his property by another. Washb. Easem. 5. Easements of all kinds may be created and exist in favor of any third person, irrespective of any privity of estate or community of interest between the parties; and in this respect there is no distinction between 'negative easements' and those rights that are more generally known as 'easements,' as a way," etc.

## At page 449 the same learned judge says:

"An owner may subject his lands to any servitude, and transmit them to others charged with the same; and one taking title to lands, with notice of any equity attached thereto, or any outstanding right or claim affecting the title or the use and enjoyment of the lands, takes subject to such equities, and such right or claim, and stands, in the place of his grantor, bound to do or forbear to do whatever he would have been bound to do or forbear to do. Lord Cottenham uses this language: 'If an equity is attached to property by the owner, no one purchasing with notice of that equity can stand in a different situation from the party from whom he purchased.' Tulk v. Moxhay, 2 Phil. Ch. 774. In the case cited, a covenant between grantor and grantee, in respect to the use of the granted premises, was enforced against subsequent grantees thereof, with notice. The rule is of universal application, as stated by Lord Cottenham. Tallmadge v. Bank, supra; Story, Eq. Jur. §§ 395, 397. Here each successive grantee from Beers, the covenantor, down to and including the defendant Lynch, the present owner, not only had notice of the covenant, and all equities growing out of the same, but took their title in terms subject to it, and impliedly agreeing to observe it. It would be unreasonable and unconscientious to hold the grantees absolved from the covenant in equity for the technical reason assigned,—that it did not run with the land, so as to give an action at law. A distinguished judge answered a like objection in a similar case by saying, in substance, that, if an action at law could not be maintained, that was an additional reason for entertaining jurisdiction in equity, and preventing injustice. The action can be maintained for the establishment and enforcement of a negative easement created by the deed of the original proprietor, affecting the use of the premises now owned and occupied by the defendants, of which they had notice, and subject to which they took title. There is no equity or reason for making a servitude of the character of that claimed by the plaintiffs in the lands of the defendants an exception to the general rule which charges lands in the hands of a purchaser with notice with all existing equities, easements, and servitudes. The rule and its application do not depend upon the character or classification of the equities claimed, but upon the position and equitable obligation of the purchaser. The language of courts and of judges has been very uniform and very decided upon this subject, and all agree that whoever purchases lands upon which the owner has imposed an easement of any kind, or created a charge which would be enforced in equity against him, takes the title subject to all easements, equities, and charges, however created, of which he has notice. Parker v. Nightingale, 6 Allen, 341; Catt v. Tourle, 4 Ch. App. 654; Carter v. Williams, 18 Wkly. Rep. 593, before Vice Chancellor James; Wolfe v. Frost, 4 Sandf. Ch. 72; Tulk v. Moxhay, supra; Whitney v. Railroad Co., 11 Gray, 359; Gibert v. Peteler, supra; Barrow v. Richard, 8 Paige, 351; Greene v. Creighton, 7 R. I. 1; Brouwer v. Jones, 23 Barb. 153."

The leading case in this state, which has been frequently cited by our own and other courts, is that of Barrow v. Richard, 8 Paige, 351, (reported in 3 Edw. Ch. 96, as Barron v. Richard.) In this case the covenant was as follows:

"Provided, however, and this indenture and the estate hereby granted are declared to be on this express condition, that there shall, at no time, be

erected, made, carried on, permitted, or suffered upon any part of the hereby granted premises any livery stable, slaughterhouse, tallow chan l'ery. smith's shop, forge, furnace, brass or other foundry, nail or other iron factory, or any manufactory for the making of glue, varnish, vitriol, ink, or turpentine, nor for the dressing or keeping skins or hides, or any distillery or brewery, nor any other manufactory, trade, or business whatsoever which shall or may be in any wise offensive to the neighboring inhabitants; and, in default whereof, this indenture, and every clause, article, or thing herein contained, shall become void to all intents and purposes." See 3 Edw. Ch. 97.

In Brouwer v. Jones, 23 Barb. 153, there was a covenant similar in form to that found in Barrow v. Richard, and Judge Emott, delivering the opinion of the court, at page 162, says:

"The object of the covenants inserted in the deeds of all the lots included in the tract of which the lots both of the plaintiffs and defendants are a part was to protect the whole tract, and every lot belonging to it, whether in the hands of the original owners or of any subsequent grantees, from nuisances or offensive and injurious erections or occupations. Every conveyance from Brouwer & Mason contained such a covenant, and every lot conveyed by them had an easement in every other lot to forbid or restrain its use or occupation in any offensive way; and therefore I am unable to see in what respect the relative dates of the conveyances to the grantees of Brouwer & Mason can make any difference. Every such covenant, in every deed given by them, was intended not only for their benefit, but also for that of all their prior, as well as subsequent, grantees, and created this easement in behalf of the whole property. This court may therefore very properly be asked to interpose in behalf of any of the owners of the lots, as being parties for whose benefit the covenants were made. The reasoning and the conclusions of Vice Chancellor McCoun and Chancellor Walworth, in the case of Barrow v. Richard, are perfectly satisfactory to me. I cannot distinguish the present case from that, taking the most favorable view of the facts here for the defendant; and I am not at all disposed to overrule so wise, well-considered, and beneficial a principle of equity as that which is asserted in these and similar cases, in the courts of this country."

These cases have been followed by many in our courts, but it is earnestly contended on behalf of the defendant that they are all to be distinguished, for the reason that in the covenants which have been before the courts for construction in such cases the words "neighboring inhabitants" are found, which are not in the covenant now under consideration, and that a different rule is therefore to be applied. It is impossible to see upon what principle the insertion of the words "neighboring inhabitants" can change the rule, for it is clear that those words do not create in such neighboring inhabitants any right of action, and that they qualify only the character of the nuisances which are forbidden. In other words, the words "neighboring inhabitants" are inserted to show that not alone are the nuisances which are expressly named prohibited, but all others which shall be injurious to such neighboring inhabitants. This view is fully sustained by the recent case of Raynor v. Lyon, 46 Hun, 227. That action was brought for the specific performance of a contract made by the plaintiff with the defendant for the sale and purchase of two lots of land on the southerly side of 143d street, in this city. By the contract the plaintiff agreed to deliver to the defendant a deed of the premises in fee simple, free from all incumbrances. The defendant resisted the performance of the agreement, upon the ground that the

deed which had been tendered would not convey the premises free from all incumbrances, and to maintain this defense it was proved that Nathaniel Jarvis, Jr., was the owner of a block of land in the city of New York in June, 1852, which block he laid out into lots, and conveyed such lots to different purchasers, on or about June 1, 1852, and that in each of the deeds there was a covenant in the following form, viz.:

"And the said party of the second part, for herself, her heirs, executors, administrators, and assigns, doth hereby covenant to and with the said party of the first part, his heirs, executors, administrators, that she shall and will not permit upon the said above granted or described premises, or any part thereof, any slaughterhouse, smith shop, forge, furnace, steam engine, brass foundry, nail or other iron factory, sugar bakery, cow stable, hogpen, or any soap, candle, oil, starch, or lampblack factory, or any manufactory of glue, varnish, vitriol, ink, or turpentine, or for the tanning, dressing, or preparing skins, hides, or leather, or any brewery, distillery, or any other noxious, unwholesome, offensive, or dangerous establishment, calling, trade, or business."

It appeared that in July, 1886, Jarvis had given a release of this covenant so far as it affected the lots in question. The special term held that the covenant in question was an incumbrance, and that the plaintiff could not comply with the terms of his contract, and refused to decree specific performance, and that the release from Jarvis was inoperative, for the reason that the covenant inured to the benefit of all grantees of Jarvis in the block. On page 230, Mr. Justice Daniels, delivering the opinion of this court, says:

"Cases quite similar in their effect to the present controversy have not unfrequently been before the courts; and deeds of property made substantially in this manner have been required to be observed in favor of the purchasers taking title in reliance upon the fact of such observance. Hills v. Miller, 3 Paige, 254; Barrow v. Richard, 8 Paige, 351; Curtiss v. Ayrault, 47 N. Y. 73; Cole v. Sims, 23 Eng. Law & Eq. 584; Whatman v. Gibson, 9 Sim. 196; Mann v. Stephens, 15 Sim. 377; Tulk v. Moxhay, 2 Phil. Ch. 775; Brouwer v. Jones, 23 Barb. 153; Gibert v. Peteler, 38 N. Y. 165; and Trustees v. Lynch, 70 N. Y. 440, where it was held that 'an easement in favor of and for the benefit of lands owned by third persons can be created by grant, and a covenant by the owner upon a good consideration to use, or to refrain from using, his premises in a particular manner, for the benefit of premises owned by the covenantor, is, in effect, the grant of an easement, and the right to the enjoyment of it will pass as appurtenant to the premises in respect of which it was created. Reciprocal easements of this character may be created upon the division and conveyances in severalty to different grantees of an entire tract, and they may be created by a reservation in a conveyance, by a condition annexed to a grant, or by a covenant, and even a parol agreement of the grantees.' Id. 447. And this principle was followed in Lattimer v. Livermore, 72 N. Y. 174, and is sanctioned by the decisions in Clark v. Martin, 49 Pa. St. 289, and Thruston v. Minke, 32 Md. 487."

This case stands unreversed, and it and the other authorities cited furnish abundant authority to support the position of the plaintiff in this action,—that the covenant in the deed from Page to Benson (defendant's prior grantor) inured to the plaintiff's prior grantor, Spaulding, and that the release from Page's widow, and sole legatee and devisee, is inoperative. The validity and binding obligation of the covenant in question, under the foregoing authorities, upon the defendant, would therefore seem to be absolutely clear, and it must be held that the defendant was in law chargeable with notice thereof.

It is next contended on behalf of the defendant that there has been such a change in the use of Fourth avenue as would make it inequitable and unjust to enforce the covenant in question as against him.    It is true, as was said by Chief Justice Church, in the case of Peters v. Delaplaine, 49 N. Y. 362, at page 367, that:

"The granting or withholding specific performance is within the discretion of the court, and it will not be granted when it would be against conscience and justice to do so. Story, Eq. Jur. §§ 161, 742, 776, and cases cited; Seymour v. Delancy, 6 Johns. Ch. 222; King v. Hamilton, 4 Pet. 311."

But there seems to be nothing in this case which should prevent a court of equity from decreeing specific performance of the covenant in question.    The covenant was made in 1882.    At that time Fourth avenue was used and occupied as a railroad avenue by the New York Central and other roads.    The only change that appears from the evidence is an increase in the number of trains which pass through the avenue, and which are switched near the defendant's land, but it cannot be held that these facts constitute such a change in the use as, under the decisions in Trustees v. Lynch, 70 N. Y. 440, and Trustees v. Thacher, 87 N. Y. 311, should prevent equity from enforcing the covenant in question.    They are simply an aggravation of the use which was contemplated by the parties, and, in view of the limited character of the covenant, no injustice can be done in requiring the defendant to live up to its terms. Under all the authorities, therefore, it would seem that the plaintiff is entitled to an injunction, as is well said by Mr. Justice Danforth in the case of Trustees v. Thacher, above cited, at page 316:

"Now, having before us a covenant binding the defendant and his breach of it, if there is nothing more, the usual result must follow, viz. an injunction to keep within the terms of the agreement; for the case would come under the rule laid down in Tipping v. Eckersley, 2 Kay & J. 264, 270, thus: 'If the construction of the instrument be clear, and the breach clear, then it is not a question of damage, but the mere circumstance of a breach of covenant affords sufficient ground for the court to interfere by injunction.'"

There have been no laches on the part of the plaintiff.    The action was commenced shortly after the filing of the plans, and before any considerable work had been done by the defendant. It is true that it appeared upon the trial of the action that, at this time, a very considerable sum of money had been laid out and expended by the defendant, but all this has been done by the defendant with full notice of the plaintiff's claim.    The defendant has erected upon his premises six private stables, each, it may be conceded upon the evidence, well built and substantially constructed in all respects, but they are stables, and front, three on Fiftieth street, and three on Fifty-First street.    Each is capable of accommodating nine horses, and each has a manure pit, which is 9 feet in length by 5 feet in width and 8 feet in depth, with a ventilating shaft and a chimney running up into the air about 35 feet, and the pits are from 75 to 150 feet from the plaintiff's building; and the conclusion is irresistible that the latter will suffer from the violation of the covenant.    The buildings are externally ornamented, and undoubtedly of good appearance, but neither the

appearance nor the character of the ornamentation can change the use to which the buildings are to be put, and the evils which necessarily flow from their use as stables.

The question which still remains for decision is as to whether an injunction should issue, or whether the plaintiff should be compensated by money damages. If the plaintiff's structure were a private dwelling house, built by a person as a home and permanent abiding place, it would seem that it would be unjust for equity to deny to the plaintiff an injunction, and to attempt to measure the wrong committed by the defendant, with money; but the plaintiff's structures are what are known as "flats" or "apartment houses," and upon the trial of the action the amount of damage which the plaintiff would sustain by reason of the use of the defendant's premises as stables was proved by competent testimony. Equity has jurisdiction to mould its relief in accordance with what is right under all the circumstances. The defendant's buildings are completed, and the chancellor should hesitate to issue an injunction, for it would appear that the defendant's buildings can be used for no other purpose than that of private stables, when money will compensate the plaintiff for the defendant's wrongful act. Equity, having jurisdiction, may undoubtedly give whatever relief is deemed most appropriate. In Madison Ave. Baptist Church v. Oliver St. Baptist Church, 73 N. Y. 82, at page 95, Judge Earl says:

"It is the practice of courts of equity, when they have once obtained jurisdiction of a case, to administer all the relief which the nature of the case and the facts demand, and to bring such relief down to the close of the litigation between the parties."

In Willard v. Tayloe, 8 Will. 557, Mr. Justice Field, delivering the opinion of the supreme court of the United States, says, at page 567:

"The discretion which may be exercised in this class of cases is not an arbitrary or capricious one, depending upon the mere pleasure of the court, but one which is controlled by the established doctrines and settled principles of equity. No positive rule can be laid down by which the action of the court can be determined in all cases. In general, it may be said that the specific relief will be granted when it is apparent, from a view of all the circumstances of the particular case, that it will subserve the ends of justice, and that it will be withheld when, from a like view, it appears that it will produce hardship or injustice to either of the parties. It is not sufficient, as shown by the cases cited, to call forth the equitable interposition of the court, that the legal obligation under the contract to do the specific thing desired may be perfect. It must also appear that the specific enforcement will work no hardship or injustice, for, if that result would follow, the court will leave the parties to their remedies at law, unless the granting of the specific relief can be accompanied with conditions which will obviate that result. If that result can be thus obviated, a specific performance will generally in such cases be decreed conditionally. It is the advantage of a court of equity, as observed by Lord Redesdale in Davis v. Hone, 2 Schoales & L. 348, that it can modify the demands of parties according to justice, and where, as in that case, it would be inequitable, from a change of circumstances, to enforce a contract specifically, it may refuse its decree unless the party will consent to a conscientious modification of the contract or, what would generally amount to the same thing, take a decree upon condition of doing or relinquishing certain things to the other party."

The use of Fourth avenue as a railroad avenue has increased materially during the past few years. The injury which the plaintiff will suffer from the defendant's wrongful act can be measured, and just compensation made therefor in money; so, under all the circumstances, and in view of all the facts in the case, the decree should be that an injunction issue as prayed in the complaint, unless defendant, within 60 days after the entry of the judgment to be entered herein, pays to the plaintiff the sum of $10,000, with interest at 6 per cent. from the date of the entry of such judgment; and, upon the payment thereof, the plaintiff must deliver to the defendant a proper release from the covenant in question, so far as it restricts the use of the defendant's premises for the purposes of private stables, such as the defendant has now erected upon his premises. Amerman v. Deane, 132 N. Y. 355, 30 N. E. Rep. 741; Pappenheim v. Railroad Co., 128 N. Y. 436, 444, 28 N. E. Rep. 518. This would seem to be in precise accord with the doctrine enunciated by the court of appeals in the Pappenheim Case; for, at page 444, 128 N. Y., and page 519, 28 N. E. Rep., Mr. Justice Peckham says:

"The owner may resort to equity for the purpose of enjoining the continuance of the trespass, and to thus prevent a multiplicity of actions at law to recover damages; and in such an action the court may determine the amount of damage which the owner would sustain if the trespass were permanently continued, and it may provide that, upon payment of that sum, the plaintiff shall give a deed or convey the right to the defendant, and it will refuse an injunction when the defendant is willing to pay upon the receipt of a conveyance. The court does not adjudge that the defendant shall pay such sum, and that the plaintiff shall so convey. It provides that, if the conveyance is made and the money paid, no injunction shall issue. If defendant refuse to pay, the injunction issues."

And this doctrine seems to have been authoritatively approved by the same court as between private individuals in the subsequent case of Amerman v. Deane, above referred to.