THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, Respondent, *v.* THOMAS BRENNAN, Appellant.

*Negative easement — when created by deeds, with like covenants, of several lots — constructive notice thereof — release given by the devisee of the original grantor — action for a perpetual injunction — alternative judgment.*

When a parcel of land is subdivided and the subdivisions are conveyed by the owner thereof to several grantees at different times, and by various conveyances, each of which contains similar restrictive covenants, an equitable negative easement is created in favor of each lot against all of the others, which the respective owners may enforce in equity.

Such a covenant is not to reserve a purely personal right to the grantor but is to restrict the uses of the land for the benefit of grantees.

An owner of real estate has constructive notice of all of the limitations and restrictions contained in the recorded conveyances forming his chain of title, and thus. is deemed to have knowledge of the existence of a restrictive covenant contained in the deed to another of a subdivision of the property whereof his real estate was a part, when he has knowledge of the situation of the surrounding property and the purposes for which it is used, besides having knowledge that an easement exists in his land in favor of other property, by which he is put on inquiry as to the property to which this easement attaches.

An easement which has thus attached to land by virtue of conveyances containing a like covenant of several parcels of a tract, is not destroyed by a subsequent release given by the devisee of the original grantor.

In an action brought, under such circumstances, to restrain the defendant from using as stables certain buildings on his lands, judgment was rendered for the plaintiff, in the alternative permitting the defendant to pay $10,000, instead of being perpetually enjoined from so using such premises.

*Held,* that the defendant had no cause of complaint.

APPEAL by the defendant, Thomas Brennan, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the city and county of New York on the 20th day of March, 1893, upon the report of a referee, restraining the defendant from using certain buildings as stables unless he paid to the plaintiff the sum of $10,000.

Prior to April 15, 1881, the trustees of St. Patrick's Cathedral and J. Augustus Page entered into a contract by which the former agreed to sell and convey, and the latter to purchase, a block of land bounded on the north by Fifty-first street, on the east by Fourth avenue, on the south by Fiftieth street, and on the west by Madison avenue.

Previous to this date the land had been divided into lots, as shown by a map attached to the deed, executed April 15, 1881, by said trustees to said Page, which conveyed lots Nos. 10 to 31 inclusive, pursuant to said contract. This deed was duly recorded April 16, 1881.

Attached to said deed, and forming a part thereof, was a map, of which the following is a copy:

FIFTY-FIRST STREET.

FIFTIETH STREET.

On the same date (April 15, 1881) said trustees, by the direction and appointment of Page, conveyed to Henry Villard lots Nos. 1 to 9 inclusive, and No. 32 as described on said map, by a conveyance, which was duly recorded April 16, 1881.

The deeds contained the following covenant, which relates to the half of the block west of lots Nos. 13 and 28, or west of the line AB : " And the said party of the second part, for himself, his heirs, executors, administrators and assigns, doth hereby covenant, promise and agree to and with the said parties of the first part, their successors and assigns, that neither he, nor any of his heirs or assigns, shall at any future time or times erect or build, or permit or cause to be erected or built, any stable, factory, machine shop, brewery, distillery, slaughter house, carpenter or smith's shop or structure or erection for the purposes of any kind of manufacturing, or for any

trade, business or employment which shall be dangerous or noxious, or constitute a nuisance upon any part of the above-described premises. And the said party of the second part, for himself, his heirs, executors, administrators and assigns, doth hereby further covenant, promise and agree to and with the parties of the first part, their successors and assigns, that no building or buildings other than first-class stone or brick front dwelling houses, or French apartment houses, shall be erected upon any part of the above-described premises, it being understood and agreed that the foregoing covenants on the part of the party of the second part shall run with the land and bind all successive owners and their heirs and assigns."

The covenant in Villard's deed relates to lots Nos. 1 to 9 inclusive, and 32, otherwise it is a copy of the above covenant.

January 10, 1882, Page conveyed, by a warranty deed, to Robert and Ogden Goelet lots Nos. 13 and 14, which deed was duly recorded January 10, 1882.

January 10, 1883, Page conveyed, by a warranty deed, to Rosanna Spaulding lots Nos. 27 and 28, which deed was duly recorded January 10, 1883.

March 1, 1883, Page conveyed, by a warranty deed, to Abraham Benson lots Nos. 15 to 26 inclusive, which deed was duly recorded March 3, 1883.

By the last three deeds Page conveyed the east half of the block and all east of the line AB. Each of these three deeds contained the following covenant: "And the said parties of the second part, for themselves, their heirs, executors, administrators and assigns, do hereby covenant, promise and agree, to and with the parties of the first part, their heirs and assigns, that neither they nor any of their heirs or assigns shall, at any future time or times, erect or build, or permit or cause to be erected or built, any stable, machine shop, brewery, distillery, slaughter house or smith shop upon said premises, it being understood and agreed that the foregoing covenants on the part of the parties of the second part shall run with the land and bind all successive owners thereof and their heirs and assigns."

May 31, 1886, Rosanna Spaulding conveyed, by a warranty deed, to James J. Spaulding lots Nos 27 and 28, which deed was duly recorded June 7, 1886.

June 1, 1888, Spaulding conveyed these lots, by a warranty deed

to William S. Maddock, which deed was duly recorded June 12, 1888.

William S. Maddock, December 20, 1888, conveyed, by a warranty deed, these lots to Eugene T. Lynch, which deed was duly recorded December 24, 1888. None of these three deeds contained or referred to a restrictive clause.

February 21, 1890, Lynch conveyed, by a warranty deed (duly recorded February 28, 1890), these lots to William H. Sturtevant. This conveyance was subject to the restrictive clause contained in the deed from J. Augustus Page to Rosanna Spaulding.

February 21, 1890, William H. Sturtevant gave a mortgage (duly recorded February 28, 1890) to Eugene T. Lynch upon these two lots to secure the payment of $90,000, which mortgage was subject to the restrictions contained in the aforesaid deed from J. Augustus Page to Rosanna Spaulding. This mortgage was subsequently assigned to the plaintiff, was afterwards foreclosed, and on August 3, 1891, the two lots were conveyed by the referee in the foreclosure action to the plaintiff. This deed was duly recorded August 3, 1891, and was subject to the restrictions contained in the deed from J. Augustus Page to Rosanna Spaulding.

February 21, 1884, Abraham Benson conveyed, by a warranty deed, to Robert C. Hine lots Nos. 15 to 26 inclusive. This deed did not contain or refer to any restrictive covenant, and was duly recorded February 23, 1884.

September 20, 1883, J. Augustus Page died, leaving a last will and testament by which he devised and bequeathed all of his estate to Mary E. Page, his widow, who, March 10, 1884, executed a release of the lots conveyed to said Hine from the covenant contained in the deed from J. Augustus Page to Abraham Benson.

March 1, 1892, the defendant, Thomas Brennan, acquired, through mesne conveyances (all duly and timely recorded), title to the land bounded on the east by Fourth avenue, on the south by Fiftieth street, on the west by a line drawn parallel with Fourth avenue and seventy-five feet therefrom, and on the north by Fifty-first street. None of the mesne conveyances contained or referred to a restrictive clause or covenant.

An apartment house, which was erected when the premises were owned by Rosanna Spaulding, stands on the plaintiff's lots.

In May, 1892, the defendant began to erect six private stables on his land, three of them fronting on Fiftieth street and three of them on Fifty-first street.

On July 9, 1892, this action was begun to restrain, perpetually, the defendant from erecting or maintaining the stables on his land.

*Samuel Untermyer*, for the appellant.

*Lucius H. Beers*, for the respondent.

Follett, J. :

In determining the rights of these litigants it is unnecessary to consider the deeds conveying the lots in the west half of the block, except in so far as they may throw light on what the grantors and grantees intended to effect by the conveyances relating to the east half of the block.

January 10, 1882, J. Augustus Page was the owner in fee of the east half of the block bounded on the north by Fifty-first street, east by Fourth avenue, south by Fiftieth street, and west by a line parallel with and 100 feet west of Fourth avenue, and designated by the letters AB on the map. This tract had been divided into sixteen lots designated by Nos. 13 to 28 inclusive, and described on the map which was recorded in the register's office April 16, 1881. This tract was then free from restrictions.

On the 10th of January, 1882, Page conveyed lots Nos. 13 and 14 to R. and O. Goelet, and January 10, 1883, he conveyed lots Nos. 27 and 28 to Rosanna Spaulding, plaintiff's predecessor in title, and March 1, 1883, he conveyed the remainder of the tract, Nos. 15 to 26 inclusive, to Abraham Benson, defendant's predecessor in title. Every one of these three deeds contained the same restrictive clause (the second in the statement of facts) and from them, and the purposes for which the neighboring real estate was at the date of the conveyances then adapted and used, the learned referee found :

" *Twelfth.* Said Page adopted and acted upon a uniform plan of restriction in making conveyances of said easterly half of said block, but this finding is not based upon any oral statements alleged to have been made by Mr. Page to Mr. John Lindley."

This is the only finding of fact challenged by the appellant on this appeal, but it seems to the court that it is sustained by the weight of the documentary evidence and by the testimony descrip-

tive of the uses of the adjacent property at the time the deeds containing the restrictive clauses were executed. The uses which could be made of the west half of the block were limited by the deeds from the trustees of the cathedral to Page and Villard, and the uses which could be made of the east half of the block were limited by the deeds from Page to Goelet, Spaulding and Benson. These restrictive covenants did not arise by chance, but out of the agreements between the grantor and his grantees, and were created for a purpose. It is apparent that the design of the parties to these covenants was not to reserve a purely personal right to the grantor, solely enforcible by him, but to restrict the uses of the land for the benefit of the grantees and their successors in interest. This purpose is apparent from an inspection of the covenant.

Three questions are involved in this appeal: (1) Did the covenants contained in the deeds from Page to Goelet, Spaulding and Benson, which conveyed the east half of the block, create an equitable easement in favor of every one of those grantees, and enforcible by either against any one of them who should violate his covenant? (2) If these conveyances created such an easement, had the defendant notice of its existence? (3) Did the release of Mary E. Page, of March 10, 1884, to Hine, discharge the lands held by him and subsequently acquired by the defendant, from the burden imposed or benefit created by the restrictive covenant?

The first question should be considered quite apart from the one of notice. The leading and best-considered case in this country which has come to our knowledge, bearing upon the first proposition, is *Parker* v. *Nightingale* (6 Allen [88 Mass.], 341), which arose out of the following facts: Tenants in common of a tract of land in the city of Boston laid it out into a street with lots of suitable size for residences, which abutted on the street and were distinguished by numbers. It was orally agreed among the co-tenants that in conveying the lots the grantees should be laid under an express obligation by way of condition or limitation, " that no other building shall be erected or built on the lot except one of brick or stone, not less than three stories in height, and for a dwelling house only." These lots were conveyed to different purchasers, all upon this condition. Forty years afterwards a subsequent grantee of one of the lots converted the building thereon into a restaurant, and thereupon several owners of the other lots filed a bill to restrain this

use of the defendant's lot, and it was held that this condition was for the benefit of the owners of all the lots held under a like condition, and that they could maintain an action to restrain the defendant from using his lot for the purpose of a restaurant. The decision was not placed upon the oral agreement entered into between the co-tenants, but it was held that an equitable negative easement arose out of the deeds in favor of the owners of the several lots. The deeds in this case did not contain a covenant on the part of the grantees, but the conveyances were on condition. Nevertheless, the condition was held to create an easement in favor of the owners of the other lots held under a common source of title on like conditions. The case was carefully considered, and the reasons for the conclusion reached are clearly stated by the learned chief judge, and the only purpose that would be served by quoting or restating the argument would be to increase the volume of our overgrown, and in great part, useless reports of cases which neither involve a new principle nor apply a well-recognized principle to new or unusual facts. This case was followed in *Sanborn* v. *Rice* (129 Mass. 387) and in *Tobey* v. *Moore* (130 id. 448), in which cases it was again held that restrictions imposed upon a number of parcels of land included in one tract in pursuance of a general scheme of improvement, may be enforced by a grantee of one parcel against the grantee of another.

In this State it has been several times held that when a parcel of land is conveyed by its owner to several grantees by independent conveyances containing similar restrictive covenants, an equitable negative easement is created in favor of each lot as against all of the others, which the owners may enforce in equity. In *Barrow* v. *Richard* (8 Paige, 351) the owner of a tract of land divided it into lots which he conveyed from time to time to purchasers. In the deed of the first five lots conveyed a condition was inserted " that the conveyance should be void if there should at any time be erected, made, carried on, permitted or suffered, upon any part of the premises so conveyed, any livery stable, slaughter house, tallow chandlery, smith's forge, furnace, brass or other foundry, nail or other iron factory, or any manufactory for the making of glue, varnish, vitriol, ink or turpentine, or for dressing or keeping skins or hides, or any distillery or brewery, or any other manufactory, trade or business whatsoever which should or might be in anywise offensive to the neighboring inhabitants."

In the first five conveyances this provision was inserted as a condition, but in the subsequent deeds it took the form of a mutual covenant between the grantor and grantees that the lots should not be used for the purposes specified. The owner of one of these lots established on it a coal yard, and an action was brought by the owner of another lot to restrain such use. Three questions arose in the case : (1) Whether an easement in favor of each lot as against the others was created by these grants? (2) Whether establishing a coal yard, which was not one of the prohibited businesses, was a violation of the covenant? (3) Whether the owner of one of the lots could restrain the owner of another from using it for a prohibited business? All three propositions were determined in favor of the complainant, the second on the ground that a coal yard, conducted as described in the bill, was prohibited by the clause "trade or business whatsoever which should or might be in anywise offensive to the neighboring inhabitants."

In *Brouwer* v. *Jones* (23 Barb. 153) the owner of a tract of land divided it into lots, and conveyed them to various purchasers, inserting in the conveyances a covenant that the property should not be used for certain purposes. The concluding clause of the covenant read as follows : " Or any manufactory, trade, business or calling whatever which may be in anywise dangerous or noxious or offensive to the neighboring inhabitants." The defendant, a subsequent grantee, established a planing mill on one of the lots, and in an action brought to restrain this use of the premises the same questions arose as in *Barrow* v. *Richard* (*supra*), and were decided in favor of the complainant. The planing mill was not mentioned in the restrictive covenant, but it was held to be covered by the sentence last quoted. It was not held in either of the foregoing cases that the ambiguous term "neighboring inhabitants" was descriptive of the class of persons in favor of whose property the easement was created. This term embraces the owners and occupiers of the restricted lots and none other, and its effect, in the connection in which it was used, was held to enlarge the scope of the covenant so as to include businesses other than those specially mentioned, and it may be that this term was effectual as a notice that persons other than the one to whom the covenant in terms ran were interested in it.

In *Raynor* v. *Lyon* (46 Hun, 227) it was held that when a person who is a common source of title of several lots imposes restrictions

on their use by the deeds by which they were conveyed, that each of the grantees and their successors in interest have an easement in the other lots conveyed with the restrictive clause. This rule was recognized in *Amerman* v. *Deane* (132 N. Y. 355), and it is laid down as an established rule of equity by various text writers. (Washb. Eas. [2d ed.] 90, 94 ; 2 Dart V. & P. [6th Eng. ed.] 864 *et seq. ;* Pom. Eq. Juris. [2d ed.] §§ 689, 1342.)

By the three deeds from Page to Goelet, Spaulding and Benson there was created an equitable negative easement in favor of every lot against all the other lots conveyed by these deeds.

Had the defendant notice of the existence of the easement? The referee did not find whether the defendant had or had not knowledge of the existence of the easement, though the defendant testified that he had no knowledge of it until after he purchased. But he had constructive notice of all of the limitations and restrictions contained in the recorded conveyances forming his chain of title, and so in law he is deemed to have had knowledge of the existence of the restrictive covenant contained in the deed from Page to Benson. He had knowledge of the situation of the surrounding property and the purposes for which it was used, which, together with his knowledge that an easement existed in favor of some property in his land, he was put on inquiry as to the property to which this easement was attached.

He was bound to search the records for conveyances by the former owners of his lot impairing or incumbering the land which he proposed to purchase. Had he done this he would have discovered the existence of the easement in favor of the plaintiff's lot.

The easement having attached to the plaintiff's lot by virtue of the conveyances, it is plain that the subsequent release by the devisee of Page did not destroy it. (*Hills* v. *Miller*, 3 Paige, 254.)

The defendant has no legal nor equitable ground for complaint, because the judgment is in the alternative, permitting him to pay $10,000, instead of being perpetually enjoined from using the premises as proposed. This question has been many times determined in the elevated railroad cases.

The judgment should be affirmed, with costs.

VAN BRUNT, P. J., and PARKER, J., concurred.

Judgment affirmed, with costs.