MICHEL C. BOUVIER, Plaintiff, *v.* CORNELIA N. SEGARDI et al., Defendants.

(Supreme Court, New York Special Term, August, 1920.)

Deeds — when restrictive covenant is for the common benefit of successive grantees — action to restrain violation maintainable.

A restrictive covenant in deeds conveying lots to various grantees "that neither the party of the second part nor his heirs or assigns shall or will at any time hereafter erect any building whatsoever within five feet of the front of said lot or either of them," is for the common benefit of all the

44

Supreme Court, August, 1920.　　[Vol. 112.

successive grantees of the property so conveyed, and any of them may maintain an action to restrain the erection of a show window which encroaches upon the restricted five feet.

ACTION for the enforcement of a restrictive covenant.

Bouvier & Beale (John Vernon Bouvier, Jr., of counsel), for plaintiff.

Hedges, Ely & Frankel (Richard Ely, of counsel), for defendant Segardi.

Lloyd N. Scott, for defendant Kalvin.

GIEGERICH, J. The plaintiff, by his first alleged cause of action, seeks judgment that the defendants be restrained from maintaining a show window or structure erected in the year 1906 upon the westerly half of the front of the premises known as No. 10 West Forty-sixth street, in the borough of Manhattan, city of New York, in violation of a restrictive covenant or set-back agreement. The second alleged cause of action seeks the removal of a portion of the structure above referred to, which it is alleged actually encroaches upon the plaintiff's premises, known as No. 12 West Forty-sixth street. The facts as to the title to the property affected by the restrictive covenant and the character of the structure erected upon the premises of the defendant Segardi in alleged violation of such covenant have been agreed upon by the parties in the form of a written stipulation. There is a conflict of testimony upon certain questions of fact, and there are a number of questions of law to be determined. The plaintiff owns the said premises No. 12 West Forty-sixth street, which are on the southerly side of the street, distant 220 feet westerly from Fifth avenue, are 20 feet wide, and were acquired by the plaintiff in the year 1912. The plaintiff is also the

owner of the premises adjoining this building on the west, known as No. 14 West Forty-sixth street, to which premises he acquired title in the year 1901. The defendant Segardi is a tenant for life of the premises known as No. 10 West Forty-sixth street, which are also 20 feet front by one-half the block in depth. The defendant Kalvin holds a lease of said premises known as No. 10 West Forty-sixth street, the term of which lease commenced on May 1, 1906, and will expire on May 1, 1921. The other defendants are subtenants of the defendant Kalvin and are actually in occupation of the premises. It appears from the stipulated facts that in or about the year 1850 John Paine and James Phalen were the owners in fee of the entire southerly side of West Forty-sixth street, beginning at a point to the east 100 feet west of Fifth avenue and extending to a point on the west 120 feet east of Sixth avenue, except a lot of land 25 feet front and rear by 100 feet and 5 inches in depth, commencing 125 feet west of Fifth avenue; that the said Paine and said Phalen, at or about the said date, were also the owners in fee of property on the northerly side of West Forty-fifth street extending approximately 300 feet easterly along the northerly line of Forty-fifth street from the premises above described; that the said Paine and said Phalen, by deed dated February 1, 1850, conveyed to William Coventry H. Waddell the premises on the southerly side of West Forty-sixth street beginning at a point 120 feet east of Sixth avenue and running easterly therefrom 400 feet along said southerly line of Forty-sixth street, with a depth of one-half the block, and in said conveyance they also conveyed to the said Waddell the premises abutting the same in the rear on the northerly side of Forty-fifth street, with a frontage on the northerly side of Forty-fifth street of 300 feet, and that such conveyance contained no

set-back covenant or restriction as imposed on other premises conveyed by them as hereafter mentioned; that beginning at the said point of 100 feet west of Fifth avenue on the southerly side of West Forty-sixth street, and extending to the easterly line of the Waddell conveyance above referred to, Paine and Phalen made the following conveyances: To Linus Scudder, 25 feet by 100 feet and 5 inches, beginning 100 feet westerly from Fifth avenue. To Edward Robinson, 100 feet by 100 feet and 5 inches, beginning at a point 150 feet west of Fifth avenue, the deed being dated December 1, 1852, and recorded December 13, 1852. To Charles Hobbs, 50 feet by 100 feet and 5 inches, beginning at a point 250 feet west of Fifth avenue, the deed being dated December 1, 1852, and recorded December 10, 1852. To Giovanna B. Pandolfini, 50 by 100 feet and 5 inches, beginning at a point 300 feet west of Fifth avenue, by deed dated December 1, 1852, recorded December 24, 1852. To Linus Scudder, 50 feet by 100 feet and 5 inches, beginning at a point 350 feet west of Fifth avenue, by deed dated December 1, 1852, and recorded December 11, 1852, being the same deed by which the plot 25 feet by 100 feet and 5 inches above referred to was conveyed to Scudder; that in each of the foregoing conveyances from Paine and Phalen the premises conveyed were described not only by metes and bounds, but by lot numbers, with reference to a map of said block made and filed by the city of New York prior to the conveyance of any of the said premises, from the city of New York to Paine and Phalen; that the uniform frontage of the lots shown on such city map was 25 feet, with a depth of 100 feet and 5 inches, and that the premises conveyed by the deed from Paine and Phalen to Robinson of 100 feet frontage, beginning 150 feet west of Fifth avenue, were also described as lots Nos. 152,

153, 154 and 155 on the said map. It may be said at this point that both the plaintiff and defendant Segardi trace their titles to Robinson, one of the grantees of Paine and Phalen. It further appears from the stipulation that the conveyance from Paine and Phalen to Robinson contained a description by metes and bounds, showing a plot of 100 feet frontage, and containing the following clause: " Party of the second part, for himself, his heirs and assigns, covenants to and with the said John Paine and James Phalen, their heirs, executors and administrators, that neither the party of the second part, nor his heirs or assigns, shall or will at any time hereafter erect any building whatsoever within five feet of the front of said lot, or either of them;" and that each of the conveyances from Paine and Phalen to Scudder, Hobbs and Pandolfini contained a set-back restriction substantially similar to that contained in the deed from Paine and Phalen to Robinson. It furthermore appears from the stipulated facts that thereafter Robinson conveyed the premises so conveyed to him to one Thomas Goadby by deed dated June 13, 1855, which deed contained the following claise: " The party of the second part, his heirs and assigns, shall not erect any building whatsoever within five feet of the front of the said lot, and except of brick or stone, with roofs of slate or metal, and shall not erect, etc., any slaughter house, smith shops, etc.," and that in said conveyance the premises were described as an entire plot by metes and bounds and also by the lot numbers. The stipulated facts further show that Goadby conveyed the premises so conveyed to him by Robinson to one Gilbert Giles, who in turn conveyed it to one David Robins, and that each of these conveyances was made subject to the restriction as last above quoted, and that both conveyances still

Supreme Court, August, 1920.    [Vol. 112.

referred to the lot numbers; that such plot of 100 feet
front was first broken up by Robins, the easterly half
of the plot becoming vested in the Fifth Avenue
Baptist Church in or about the year 1864, Robins
retaining the westerly half of such plot; that in the
conveyance of the easterly half of the plot from Robins
to the said church all reference to the restrictive cove-
nant was omitted, and that shortly subsequent to the
month of April, 1864, the said church erected upon the
said premises and other adjoining lands which it had
acquired a church structure which from the date of its
construction has stood and still stands out to the build-
ing line, as does also the building on the parcel of 100
fee tto the eas of the church running to Fifth avenue.
It also appears from the stipulated facts that by deed
dated January 6, 1868, Robins conveyed to James B.
Martin a plot 20 feet front by 100 feet and 5 inches
in depth, adjoining on the west the premises conveyed
to the Baptist Church, the deed containing the follow-
ing clause: '' Subject, nevertheless, to the covenants
and restrictions as to the erection of buildings on said
premises and the uses and occupation thereof con-
tained in the deed of said premises to Thomas Goadby,
bearing date the 13th day of June, 1855, recorded in
Liber 682, page 498;'' that Martin left a last will and
testament, which was duly admitted to probate in the
city of Milwaukee, state of Wisconsin, by the terms of
which the premises owned by him were devised to the
defendant Segardi for her natural life; that in 1863
Robins conveyed the remaining 30 feet of the westerly
frontage to one Eastman, through whom the plaintiff,
by mesne conveyance, acquired his title to the whole
of the premises known as No. 12 and part of No. 14
West Forty-sixth street, and that all the conveyances
of the same repeated the said restriction or contained
a reference thereto, except in the deed dated June 8,

1900, from one Ghislani Durant to one J. Morgan
Howe, the plaintiff's grantor, of the premises imme-
diately to the west of those conveyed to Martin and
having a frontage of 20 feet. As shown above, the
Baptist Church, to the east of the defendant's building,
has been erected in violation of the restrictions above
set forth, but it appears from the evidence that the
set-back restriction has been observed from the west-
erly side of such building for a distance of 180 feet
westerly from Fifth avenue, and that all of the build-
ings for that distance are set back 5 feet from the
building line. It further appears from the stipulated
facts that before Martin acquired title to the premises
known as No. 10 West Forty-sixth street and now held
by the defendant Segardi as a life tenant, there was
erected thereon a brownstone front residence, the east-
erly portion of which was about one-third of the total
width of said premises and stood out to the building
line; that the westerly portion of the residence so
erected was set back 5 feet from the building line upon
the same line as the structure of the plaintiff on the
west, and a portion of such residence had an oblique
line between the easterly and westerly portions
thereof; that the said structure so erected stood
unchanged for upwards of forty years, until the erec-
tion in the year 1906 of the store front and show win-
dow by the defendant Kalvin, and that, except as said
front was modified in 1906, the said structure stands
as originally erected more than forty years ago; that
in or about the year 1906, and more than ten years
before the commencement of this action, there was
constructed a show window 35 feet in height, made of
glass, wood and metal, on the westerly half of the
defendant's building, which said show window was
brought out to the building line, and that such show
window was actually constructed by the defendant

Kalvin with the knowledge, consent and approval of the defendant Segardi, and consistently with the terms of the lease granted to the defendant Kalvin by the defendant Segardi of the said premises No. 10 West Forty-sixth street, which covered a period of fifteen years, commencing on the 1st day of May, 1906, by whom the plans were approved, it being contemplated by the said lease that the alteration or improvement to the said premises should remain the property of the defendant Segardi upon the termination of Kalvin's lease. The parties further stipulated that in the year 1916 the city of New York, by its proper officers, compelled the owners of all the property on the southerly side of Forty-sixth street, between Fifth and Sixth avenues, to remove all buildings and other incumbrances which extended beyond the building line. The plaintiff testified that after the observance of such requirement the structure on the defendants' premises became much more conspicuous and objectionable. It has been stipulated between the plaintiff and all defendants, except the defendant Segardi, that in the event that injunctive relief is granted to the plaintiff the enjoining order shall provide that the present structure may remain until May 1, 1921, and that the plaintiff will not seek to enforce any judgment for money damages or costs against such defendants. It is stated in the plaintiff's main brief that the foregoing stipulation was entered into in order that the removal of the structure complained of may cause the defendants the least damage. Coming now to the consideration of the various points raised by the defendant Segardi, it is urged on her behalf that there is no covenant enforcible in equity in respect to the set-back restriction in favor of the plaintiff against her premises. The plaintiff, on the other hand, maintains that the restrictive covenant was created for the benefit of

the grantees of the property comprised within the restricted area, and their heirs and assigns, and that the case falls directly within the first class described in the opinion of the Court of Appeals in *Korn* v. *Campbell,* 192 N. Y. 490. Since reliance is placed by the plaintiff upon the rules laid down in that case with respect to that particular class of restrictive covenants, it will be well at the outset to quote from that portion of the opinion which contains the same. Referring to restrictive covenants, the opinion, at page 495, says: '' Such covenants may be broadly divided into three classes. In the first class may be placed those which are entered into with the design to carry out a general scheme for the improvement or development of real property. This class embraces all the various plans generally denominated in the English cases as building schemes, under which an owner of a large plot or tract of land divides it into building lots to be sold to different purchasers for separate occupancy, by deeds which contain uniform covenants restricting the use which the several grantees may make of their premises. In such cases the covenant is enforcible by any grantee as against any other upon the theory that there is a mutuality of covenant and consideration which binds each, and gives to each the appropriate remedy. Such covenants are entered into by the grantees for their mututal protection and benefit, and the consideration therefor lies in the fact that the diminution in the value of a lot burdened with restrictions is partly or wholly offset by the enhancement in its value due to similar restrictions upon all the other lots in the same tract. Illustrations of this class may be found in *De Gray* v. *Monmouth Beach Club House Co.,* 50 N. J. Eq. 340; *Parker* v. *Nightingale,* 88 Mass. 342; *Nottingham P. B. & T. Co.* v. *Butler,* L. R. 15 Q. B. D. 261, and *Barrow* v. *Richard,* 8 Paige, 351.''

In *Nottingham P. B. & T. Co.* v. *Butler, supra,* Wills, J., at page 268, said: "The principle which appears to me to be deducible from the cases is that where the same vendor selling to several persons plots of land, parts of a larger property, exacts from each of them covenants imposing restrictions on the use of the plots sold without putting himself under corresponding obligation, it is a question of fact whether the restrictions are merely matters of agreement between the vendor himself and his vendees, imposed for his own benefit and protection, or are meant by him and understood by the buyers to be for the common advantage of the several purchasers. If the restrictive covenants are simply for the benefit of the vendor, purchasers of other plots of land from the vendor cannot claim to take advantage of them. If they are meant for the common advantage of a set of purchasers, such purchasers and their assigns may enforce them inter se for their own benefit." The judgment in the foregoing case was affirmed in the Court of Appeal. L. R. 16 Q. B. Div. 778. Some years before *Korn* v. *Campbell, supra,* was decided, a covenant restricting the use of premises was considered by our Court of Appeals in *Equitable Life Assurance Soc'y* v. *Brennan,* 148 N. Y. 661, which case is relied on by the defendant Segardi in support of the point above stated. There the covenant contained in the different deeds made by the common owner were not similar and the evidence *aliunde* the documents tended to negative rather than support the claims of mutual easements, and it was held in the light of such evidence that the deeds relied on, which merely disclosed a covenant binding the grantee, his heirs and assigns, for the benefit of the grantor, did not afford sufficient evidence to sustain a finding that a uniform plan of restrictions was established. The court in that case, however, at pages 671 and 672, laid

down the following rules: " While it may not be possible to harmonize all the authorities in this country and England on the subject of equitable negative easements, yet a few general rules may be regarded as settled by the cases. It is not necessary in order to sustain the action that there should be privity either of estate or of contract; nor is it essential that an action at law should be maintainable on the covenant; but there must be found somewhere the clear intent to establish the restriction for the benefit of the party suing or his grantor, of which right the defendant must have either actual or constructive notice. If the covenant is silent; if there is no mutual agreement or understanding between the various owners creating an easement; if there is nothing in the surrounding circumstances from which mutual rights can be fairly inferred, then no action can be maintained. There is a class of cases where the covenant, by a fair interpretation of its language is not exclusively for the benefit of the grantor, but of other property owners in the immediate vicinity (*Barrow* v. *Richard,* 8 Paige, 351; *Brouwer* v. *Jones,* 23 Barb. 153; *Seymour* v. *McDonald,* 4 Sandf. Ch. 502; *Lattimer* v. *Livermore,* 72 N. Y. 174)." Speaking of that decision in *Silberman* v. *Uhrlaub,* 116 App. Div. 869, 872, the Appellate Division said: " That case recognized the general principles which support the judgment appealed from, to wit, that the violation of a restrictive covenant creating a negative easement may be restrained at the suit of one who owns property for whose benefit the restriction was established, irrespective of whether there was privity either of estate or of contract between the parties, or whether an action at law was maintainable, and that where a uniform plan of improvement, restricting the use to which each parcel of a tract can be put, is adopted, and parcels are sold

in reference to such plan, mutual negative easements are created irrespective of the order of the conveyances and of whether the restrictive covenant is expressed in the deed.'' The same court, in *Landsberg* v. *Rosenwasser,* 124 App. Div. 559, again speaking of that decision, at page 561, said: '' The court recognized the rule in that case that where a single tract is divided into parcels, and the parcels are conveyed by deeds containing similar restrictive covenants pursuant to a uniform plan adopted for the benefit of all, mutual negative easements are created, each parcel becoming both a servient and dominant tenement, and that privity of estate or contract is unnecessary to enable the owner of one parcel to maintain an action to restrain the violation of his rights. Some of the leading authorities on the subject are collated in *Silberman* y. *Uhrlaub* (116 App. Div. 869). The reason for the rule is that where all the parcels of a tract are conveyed subject to a uniform plan of restriction intended to benefit the entire tract, and of a character likely to induce purchases, it would be inequitable not to imply mutual reciprocal rights, hence the doctrine of equitable negative easements.'' Under the rule established in *Clark* v. *Martin,* 49 Penn. 289, it would appear that it is not necessary to show that there was a general plan of lots in order to make the restrictive covenant enforcible between subsequent grantees. In that case the restriction affected two city lots, and the defendant, in support of his contention that the covenant was not enforcible, advanced the argument that no general plan of lots had been shown. This was held not to be necessary, the court saying (p. 298): '' It is not because a plan is deranged that the court interferes, but because rights are invaded, or about to be; and this fact may exist in a plan of two lots, as well as in one or two hundred. The plan often furnishes

the proof of the terms on which sales were made; but the fact of the alleged terms is as effective when proved by a single deed as when proved by a plan.'' The rules laid down in *Korn* v. *Campbell, supra; Nottingham P. B. & T. Co.* v. *Butler, supra,* and *Equitable Life Assur. Soc'y* v. *Brennan, supra,* were applied in *Beach* v. *Jenkins,* 174 App. Div. 813; where it was, among other things, held that the restrictive provisions contained in the conveyances of the lots of the common owner are to be regarded as in the nature of covenants; that a restrictive covenant is enforcible even though the plaintiff's premises were conveyed to his predecessor before the conveyance to the predecessor of the defendant where the restrictions in the deed of the latter were for the benefit of the plaintiff's premises, and that a restrictive covenant runs with the land and is binding upon any owner of property affected by it, notwithstanding the deed to the defendant contains no restrictive covenant. The rule last mentioned that the covenant runs with the land was applied in *Booth* v. *Knipe,* 225 N. Y. 390, where it was said by the court that a restrictive covenant of the kind considered was sometimes for the benefit of the grantor personally and sometimes for the benefit of successive lot owners; that whether it is of the one class or of the other is question of intention, and that the intention is to be gathered not merely from the language of the deed, but from all the surrounding circumstances. It is urged by the defendant Segardi in support of her said claim that the covenant in suit is not enforcible by the plaintiff against her premises; that Paine and Phalen, the common owners, did not make a division of their property; that there was no building or improvement plan or scheme in pursuance of which the covenant was imposed; that the common owners conveyed 400 feet frontage on Forty-sixth

street to Waddell without any restriction or covenant whatsoever; that they subsequently conveyed their remaining property with restrictions, and that all the plaintiff can rely on is that the same covenant appears in the deeds given by the common grantors to their various grantees, which circumstance, it is argued, is not sufficient evidence that the covenant was imposed for the mutual benefit and protection of the remaining lands of the common owners. While it is true that the common owners did not make and file a separate map of their remaining lands, they nevertheless adopted a map of the block in question which had theretofore been made and filed on behalf of the city of New York and which divided the common owners' tract, as well as the entire block, into lots showing a uniform frontage of the lots of 25 feet and a depth of 100 feet and 5 inches, and in the various conveyances of lots comprised within the restricted area the premises conveyed were described, not only by metes and bounds, but by the lot numbers with reference to such city map. As the block in question had already been divided into lots by the city of New York, from whom the common owners derived title, there was no necessity for their making any further subdivision of their remaining tract unless they deemed it to be to their advantage to do so, which does not appear to have been the case. The city map was on file open to the inspection of intending purchasers, and from it they could obtain all the information desired as to the location and dimensions of the various lots offered for sale. The common owners sold to various purchasers parcels comprising in one instance one lot, in another four lots and in three instances two lots. The words of the restrictive covenant contained in such deeds " that neither the party of the second part nor his heirs and assigns shall or will at any time hereafter erect any

building whatsoever within five feet of the front of
said lot or either of them,'' show that each lot when it
was improved was to be for the separate occupancy of
those who might acquire title thereto. There was
one comprehensive scheme or plan contemplated by
the parties when they entered into the restrictive cove-
nant, and that scheme or plan clearly appears in the
deeds of the common grantors to their various
grantees. That uniform plan or scheme was that no
building that might thereafter be erected upon either
of the lots conveyed should be built within 5 feet of
the building line, and when carried out would make the
buildings erected attractive and suitable for resi-
dential purposes and give an open, uniform space of
5 feet from the building line on the front of the lots
which might then have been used for stoops and court-
yards. The plan or scheme for the building or
improvement of the lots and the rights and duties of
the parties are clearly stated in the restrictive cove-
nant in suit and no maps, drawings, terms of sale or
other writings could show them more explicitly. As
already shown, a general plan is only one means of
proof of the existence of the rights and duties of
the parties and the terms on which sales of the lots
were made, which may be proved by a single deed.
*Clark* v. *Martin, supra.* It should be borne in mind
that the lands comprised within the restricted area
were the remainder of the holdings of the common
owners. I do not think that the fact that they did
not impose any restrictions as to the use of the land
previously conveyed to Waddell affects the question
under consideration in any way. So far as the record
discloses, Paine and Phalen were the absolute owners
of the remaining lands without any restriction of any
kind whatsoever as to their improvement or use, and
they were free to do with them as they pleased, and

Supreme Court, August, 1920.        [Vol. 112.

they thus had a right to impose such restrictions not against public policy as to such remaining lands as they saw fit. *Rowland* v. *Miller,* 139 N. Y. 93, 102; *Korn* v. *Campbell, supra,* 496. As I gather from a reading of the restrictive covenant imposed by them upon each purchaser of lots, and all the surrounding circumstances as well, the lots were purchased with reference to the plan or scheme mentioned above. Such being the case, the next question to be determined is whether the negative restrictive covenants so contained in the deeds of the various purchasers of such remaining lands of the common owners were for the benefit of the grantors personally or for the benefit of successive lot owners within the restricted area. The solution of that question is to be found in the intention of the parties which, as already stated, may be gathered not merely from the deeds but from all the surrounding circumstances. As already shown, the deeds of the different grantees of land within the restricted area contain uniform covenants and they are dated the same date, although recorded on different days of the month of December, 1852, on the first day of which month all of said deeds are dated. The lands so conveyed were all of the remaining lands of Paine and Phalen and they retained none whatever. Under these circumstances, the inference is fairly warranted that the covenant was intended for the common benefit of all the grantees of the property so conveyed. This conclusion is supported by the following language of Wills, J., in *Nottingham P. B. & T. Co.* v. *Butler, supra,* at page 269, which is peculiarly applicable: " It appears to me that, where land is put up to auction in lots, and two or more persons purchase according to conditions of sale containing restrictions of the character of those under consideration in the present case, it is very difficult to resist the inference that they

were intended for the common benefit of such pur-
chasers, especially where the vendor purposes (as in
the present case) to sell the whole of his property.
Where he retains none how can the covenants be for
his benefit; and for what purpose can they be proposed
except that each purchaser, expecting the benefit of
them as against his neighbors, may be willing on that
account to pay a higher price for his land than if he
bought at the risk of whatever use his neighbor might
choose to put his property to? Where, therefore, the
vendor desires to sell at the auction the whole of his
property, the inference is strong that such covenants
are for the common benefit of the purchasers.'' As al-
ready stated, the judgment in the case just quoted from
was affirmed. Lord Esher, M. R., delivered one of the
opinions when that case was decided in the Court of
Appeal and in the course of his opinion, adverting
to the subject above discussed by Wills, J., at page 785,
said: '' It is a most material circumstance whether the
vendor reserves any part of the property for himself.
If he does not reserve any part, that is almost if not
quite conclusive (unless there is something contradic-
tory) that the covenants which he takes from the pur-
chasers are intended for the benefit of each purchaser
as against the others.'' The record does not disclose
whether the remaining lands of the common owners
were sold at public or private sale. If they were sold
at private sale, the reasoning of these jurists is by
analogy equally applicable to a sale of that character.
The result must naturally be the same in either case,
if the vendor no longer has any property left to pro-
tect. As pertinently remarked by Wills, J., '' Where
he retains none how can the covenants be for his bene-
fit? '' Logically they must be for the benefit of the
purchasers. It is urged, however, by the defendant
Segardi, that inasmuch as the common owners did not

45

stipulate with the first purchaser of their remaining lands that they would exact similar covenants from those who might thereafter purchase the remainder of such lands, that fact is strong proof of their intention to restrict the property for their own individual benefit. *Mulligan* v. *Jordan,* 50 N. J. Eq. 363, is cited in support of this contention. As I read that case, it only decided that where the complainant's deed is prior to that of the defendant and there is no covenant to the former from the grantor that he holds the remainder of the property subject to the same restriction or that he will exact similar covenants from the purchasers of the remaining property and the complainant is not the express assignee of the defendant's covenant and there is no covenant between the complainant and the defendant, the complainant could not enforce the covenant in the absence of anything to show that the covenant was entered into for the benefit of the complainant's property. It will thus be seen that the decision in that case was based upon the ground that there was no evidence that the covenant was entered into for the benefit of the complainant's property, the other matters being mentioned merely for the purpose of showing the absence of certain elements the existence of any one of which might have saved the covenant. In the present case, however, the facts show that the restrictive covenant was created for the benefit of the different grantees of the remaining lands of the common grantor, and therefore this case is distinguishable from the *Mulligan* case and *Summers* v. *Beeler,* 90 Md. 474, which followed that case and which is also relied on by the defendant Segardi. So far as concerns the question whether or not the plaintiff's claim is barred by the Statute of Limitations, the case of *Galway* v. *Metropolitan E. R. Co.,* 128 N. Y. 132, is con-

clusive authority that it is not barred. It was there held that no lapse of time or inaction merely, on the part of an owner after erection and during the maintenance of an unlawful structure, is sufficient to defeat the right of the owner to his action at law or equity, unless it has continued for such a period of time as will effect a change of title in the property or authorize the presumption of a grant. Another point urged by the defendant Segardi is that the plaintiff has been guilty of *laches,* which should bar his right to a recovery. This contention is based upon the fact that when the alterations in the defendants' premises were made in 1906 the plaintiff then resided at No. 14 West Forty-sixth street and knew that they were being made, and that six years afterward the plaintiff purchased the premises adjoining on the east and known as No. 12 West Forty-sixth street, the property claimed to have been damaged by the structure on the defendant's property. The defendant Kalvin testified that in 1906 while the work connected with the alterations in the defendant's premises was going on the plaintiff saw him several times and the plaintiff " wanted to know about the cost and the amount of my improvement and how much good it would do and what rental I expected to get, and all that sort of thing." He was then asked the following question and made the following answer: "Q. Was anything said by Bouvier regarding the carrying of this structure out to the building line? A. Not at all." The plaintiff did not contradict the testimony so given by the defendant Kalvin. He testified, however, that after the removal of all stoops and other obstructions extending beyond the building line in the vicinity of the premises in question in obedience to the requirements of the municipal authorities, the structure on the defendants' premises became more conspicuous and objectionable to him, and that thereupon the plaintiff

requested its removal. I do not think that the evidence to which attention has just been called discloses any acquiescence by the plaintiff in the maintenance of the structure complained of. Neither do I think, upon the facts as they appear in the record, that the plaintiff has been guilty of *laches*. The mere failure to protest does not bar the plaintiff's right to relief. Speaking of the doctrine of acquiescence, the Court of Appeals, in *Galway* v. *Metropolitan E. R. Co., supra,* at page 153, said: "But this question we also think is governed by authority equally conclusive with, that relating to the Statute of Limitations. The doctrine of acquiescence as a defense to an equity action has been generally limited here to those of an equitable nature exclusively, or to cases where the legal right has expired, or the party has lost his right of property by prescription or adverse possession. Whatever may be the rule in other states, it can be said that here, no period of inaction merely has been held sufficient to justify a nuisance or trespass, unless it has continued for such a length of time as will authorize the presumption of a grant. The principle that so long as the legal right exists the owner is entitled to maintain his action in equity to restrain violations of this right, has been uniformly applied in this court." It should be observed that there is a clear distinction between the case of an application for an equitable remedy to enforce a legal right and the case where an exclusive equitable remedy is sought. The present case is of the former class. The plaintiff seeks an equitable remedy to enforce a legal right. With respect to the defense of *laches*, it may be well to quote from the opinion of the court in some of the leading cases wherein that subject was discussed. In *Cox* v. *Stokes,* 156 N. Y. 491, 511, the court said, concerning the defense of *laches:* "Whether the equitable doctrine of *laches*, as distin-

guished from the Statute of Limitations, now exists in this state, is open to serious doubt." In *Rothschild* v. *Title Guarantee & T. Co.*, 204 N. Y. 458, 461, the court said: " The law does not withdraw its remedies from a person against whom a wrong is committed merely because he in silence and without proclamation or complaint recognizes and endures the wrong." In *Ackerman* v. *True*, 175 N. Y. 353, it was held that mere silence upon the part of the plaintiff during the construction and continuation of the encroachment, unless continued for such a length of time as would authorize the presumption of a grant, does not constitute such *laches* and acquiescence upon her part as will deprive her of the right to a mandatory injunction. Under the principle enumerated in these cases it is clear that the mere silence of the plaintiff did not estop him from asserting his right to have the structure complained of removed. The case of *Pappas* v. *Excelsior Brewing Co.*, 170 App. Div. 692, relied on by the defendant Segardi, is clearly distinguishable from the case at bar, because in that case it was shown that the plaintiff and his predecessor in title had themselves violated the very covenant he sought to enforce. No such situation is presented in the present case, and neither upon any facts special to this case, nor under the general authorities above stated, has the plaintiff's right to relief been barred by *laches* or acquiescence. The next question to be determined is whether the defendant Segardi has a prescriptive right to maintain the structure complained of, which she claims to have acquired. In this connection it should be borne in mind that the plaintiff seeks the removal only of the structure or show window which was added to the building in 1906. In other words, he seeks to restore the conditions existing in 1906. It is urged in support of the claim of prescriptive right made by the defend-

ant Segardi that she and her predecessors in title have openly and notoriously violated the restrictive covenant by maintaining on the easterly front, for about one-third thereof, a structure carried out to the building line. The fact that the covenant was broken as to the easterly front third of the building did not, however, give the defendants a prescriptive right to break the covenant for the full width of their lot. *Lattimer* v. *Livermore,* 72 N. Y. 174; *Rowland* v. *Miller, supra.* As was said by the court in *Lattimer* v. *Livermore, supra,* at page 183: '' The fact that she chose to give up part of her easement, did not authorize the owners of the several lots to deprive her of the whole.'' In *Rowland* v. *Miller, supra,* the court, at page 103, said: '' In order to have the benefit of the agreement she (the plaintiff) is not obligated to sue all its violators at once. She may proceed against them *seriatim,* or she may take no notice of the violations of the agreement by business carried on remotely from her residence, and enforce it against a business specially offensive to her by its proximity.'' Another point made by the defendant Segardi is that because the original size of the lot immediately adjoining the Baptist church on the west thereof was departed from in the conveyance made by a certain grantor some years after the restrictive covenant was imposed by the common owners the covenant cannot be enforced. The facts with regard to such point, briefly stated, are as follows: The defendant Segardi's testator, as above shown, acquired from Robins his title to the premises No. 10 West Forty-sixth street, the premises complained of, which, as above shown, have a frontage of 20 feet and are a portion of the lands conveyed by the common owners to Robinson, which had a frontage of 100 feet on West Forty-sixth street. As above shown, Robins became the owner of such 100-foot

plot by sundry mesne conveyances from Robinson, and he conveyed the easterly 50 feet thereof to the Baptist church, and the next 20 feet to the west to the defendant Segardi's testator, and the remaining 30 feet, being the most westerly portion, to Eastman. It will be observed that the conveyances so made of the westerly half of the plot by Robins were a departure from the arrangement of 25-foot lots, as shown on the city map, one conveyance conveying 20 feet and the other 30 feet, instead of each conveying 25 feet. The plaintiff acquired by various mesne conveyances from Eastman the title to a frontage of 20 feet immediately to the west of the premises conveyed to the defendant Segardi's testator, the premises so conveyed having the street number 12 West Forty-sixth street. The plaintiff also owns the premises known as No. 14 West Forty-sixth street, which has a frontage of 24 feet, which immediately adjoins No. 12 on the west. The plaintiff's two properties have thus a combined frontage of 44 feet on the said street. The plaintiff acquired his title to No. 14 as follows: 10 feet thereof by mesne conveyances from Eastman and the remaining 14 feet thereof by mesne conveyances from Hobbs, the grantee of the common owners. The defendant Segardi advances the argument that since Robins conveyed 20 feet of the lot immediately adjoining the Baptist church on the west to her testator and the remainder, together with lands adjoining on the west, to Eastman, and since the dimensions of the lot so conveyed were 25 feet according to the city map, the plaintiff is in no position to enforce in favor of his part of the original 25-foot lot and against the balance thereof the restrictive covenant which was originally imposed against the whole lot. In other words, that the land which comprised one original lot cannot be both dominant and servient as to itself. The difficulty

with this contention is that it loses sight of the fact that the conveyances made by the common grantors of their entire remaining tract contained uniform restrictive covenants which were intended for the benefit of all their grantees and their heirs and assigns and for the protection not of a single individual lot, but of all the lots conveyed and whereby mutual negative easements were created, each parcel becoming both a servient and dominant tenement (*Landsberg* v. *Rosenwasser, supra,* at page 561; *Hart* v. *Little,* 103 Misc. Rep. 620, 626), and of the further fact that the deeds from Eastman conveying to different grantees portions of the said 25-foot lot so adjoining the Baptist church on the west each repeated the said restriction or contained a reference to it, thus showing the intention of the parties that each of such grantees should have the benefit of the restriction with respect to the remainder of that particular lot. These facts, among others which need not be mentioned, distinguish the present case from *King* v. *Dickeson,* L. R. 40 Ch. Div. 596; *Dana* v. *Wentworth,* 111 Mass. 291, and *Barney* v. *Everard,* 32 Misc. Rep. 648, which cases have been cited in support of the point so urged by the defendant Segardi. Having reached the conclusion that the covenant in suit is enforcible in equity in favor of the plaintiff against the defendant's premises, there remains for consideration the question whether or not the covenant should, under all the circumstances disclosed by the record, be enforced in the case at bar. In *Zipp* v. *Barker,* 40 App. Div. 1, 6, the court said: " We might assume that originally the covenant had relation to the condition of the property at that time and that the coparceners had no thought of its coming change; but it is difficult to see why the maintenance of the easement is not more essential to the value of the plaintiff's property as business premises than it would be

if it were used as a residence." In *Batchelor* v. *Hinkle,* 210 N. Y. 243, the Court of Appeals, at page 252, said: " In determining whether a court of equity will compel observance of a covenant restricting the use and occupation of land, each case must depend upon the facts which it presents." In that case, the plaintiff sought to restrain the defendants from erecting a building out to the building line on their adjacent lot in violation of a set-back covenant contained in the deeds of the common grantor to the different grantees of the property. It appeared from the findings that the object which the parties to the covenant intended to accomplish had practically been defeated in the lapse of time and that courtyards designed for ornament were out of place in front of buildings for commercial purposes; that the plaintiff had suffered no substantial damage from the erection of the defendants' building on the street line, but, on the contrary, both the market and rental value of the property, and of all the other property in the block, had been increased thereby; that the defendants' building was 115 feet distant from the plaintiff's lot and could not materially interfere with the actual use of her property; that the lots on the north side of Twenty-sixth street, where there was no " set-back " covenant in force, were largely built up to the street line with commercial buildings; that the owners of all the property on the street affected by the covenant, except the plaintiff and the owner of the lot at the corner of Broadway, were willing to have the restriction abrogated, that the defendants, in good faith, erected their building on the street line, believing they had the right to do so, and that it would cost $66,000 to remove that part of the structure which stood on the five-foot space. The court said that the plaintiff had suffered no damage, while the defendants would be greatly

damaged by the granting of the relief sought and that, under the circumstances, it would be inequitable to give the judgment asked for by the plaintiff. There is no such situation in the case at bar. The neighborhood in West Forty-sixth street in the vicinity of the plaintiff's premises has not so changed as to render the restrictive covenant obsolete and valueless. On the contrary, the evidence satisfies me that it is of substantial value to the plaintiff. Although the street, at the point in question, has ceased to be strictly residential, it is shown by the evidence that the wide appearance, caused by setting the buildings back, is a distinct advantage for retail trade of the highest class, and that the observance of the set-back restriction benefits the abutting property. The plaintiff's building, known as No. 12 West Forty-sixth street, and the one adjoining on the west, also owned by him, and the successive structures standing to the west thereof for a distance of 180 feet from the westerly line of the defendants' property, stand back 5 feet from the building line. Immediately adjoining the plaintiff's buildings on the westerly side there has been erected within the last three years a modern twelve-story building, 44 feet in width, and this building is set back 5 feet from the building line, and the owners of that building, according to the evidence, would be prompt to seek enforcement of the set-back covenant in case of a violation or attempted violation of its conditions. It appears, moreover, that the property owners have formed an association to maintain the character of the street. The buildings on the northerly side of Forty-sixth street, commencing 100 feet west of Fifth avenue and extending to within 100 feet of Sixth avenue, are set back from the building line at the present time. The structure complained of, according to the plaintiff's testimony, is of a flimsy character, and has the

appearance of having been built to remain only temporarily, and it obstructs the view of his building immediately adjoining on the west thereof. It appears from the evidence that the cost of removing the obstruction complained of will be approximately $2,500, and that if it is not removed the damage to the fee value of the plaintiff's premises will be approximately $20,000, and the diminution in the rental value will be approximately $3,000 annually. After considering all the evidence, I am clearly of the opinion that the covenant should be enforced, and that the plaintiff is entitled to the relief he seeks in the first cause of action alleged, and should have judgment against the defendants, and each of them, restraining them from maintaining the structure or show window complained of, or any other structure or building which encroaches or extends over the front strip of the plaintiff's premises, 5 feet in depth, and which adjoins the southerly side of West Forty-sixth street, except that the easterly third of the front of the building now erected on defendants' premises may stand out to the building line, and that the middle third of the face of said building may stand obliquely to a point distant 5 feet southerly from the said building line. Furthermore, the plaintiff should have judgment against the defendants Kalvin and Segardi requiring them to remove the said structure or show window above referred to, or so much of the building as encroaches upon the said restricted strip of 5 feet in depth, except that the easterly third of the front of the said building may stand out to the building line, and that the middle third of the face of the said building may stand back obliquely, as above indicated. The judgment, however, shall provide that the structure or show window complained of may remain until May 1, 1921. Costs are awarded to the plaintiff against the defendant Segardi. With

Supreme Court, August, 1920.    [Vol. 112, Misc.]

respect to the second cause of action, it appears from the evidence that the westerly column supporting a portion of the structure or show window complained of encroaches two and one-half inches upon the plaintiff's premises.  The defendant Segardi maintains that since the encroachment is less than six inches the correct method of relief, if the plaintiff is entitled to any at all, should be obtained under the provisions of section 1499 of the Code of Civil Procedure, and not by an equity action of this character.  A sufficient answer to this contention is that the section referred to does not apply, because no building has been erected on the plaintiff's land abutting that part of the defendant's wall.  *Goldbacher* v. *Eggers,* 38 Misc. Rep. 36, 42; *Bergman* v. *Klein,* 97 App. Div. 15, 17.  The plaintiff is therefore entitled to judgment as prayed for with respect to such second alleged cause of action.  The plaintiff has submitted requests for findings, but neither of the defendants has done so.  The defendants may submit their respective requests to find within thirty days after the publication of this memorandum, and within the same time the plaintiff may withdraw the requests submitted by him and substitute new ones instead.  All papers received by me, including exhibits, briefs and stenographer's minutes, have been returned to the clerk, to whom all requests to find should be presented, with proof of service.

Ordered accordingly.